THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAN W. SMITH, Defendant-Appellant.

Second District    No. 79-245

Opinion filed December 24, 1980.

Mary Robinson and Josette Skelnik, both of State Appellate Defender's Office, of Elgin, for appellant.

Peter J. Woods, State's Attorney, of Oregon (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE VAN DEUSEN delivered the opinion of the court:

On September 5, 1978, an information was filed against the defendant, Dan Smith, and Mary Smith, charging them with the murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)) and armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2(a)) of Clifty Davis. These offenses were committed on August 25, 1978. Mary Smith's case was severed from that of the

defendant prior to trial. After a trial by jury, the defendant was found guilty of both offenses. The State sought to impose the death penalty, and the defendant waived a jury for the purpose of sentencing. After holding a separate sentencing hearing to determine whether the death penalty should be imposed, the trial court concluded that sufficient mitigating circumstances were present which precluded the imposition of the death penalty. The court subsequently sentenced the defendant to a term of natural life imprisonment on the murder conviction and to a concurrent term of 50 years' imprisonment on the armed robbery conviction. The defendant appeals.

On appeal, the defendant first contends that the trial court erred in not suppressing two incriminating statements which he alleges were elicited in violation of his right to counsel as provided in the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) and section 8, article 1, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. 1, §8). More specifically, he asserts that his tape-recorded statement of September 3, 1978, was the product of an unlawful intrusion into the attorney-client relationship which occurred when his attorney was refused permission to meet with him at 3 p.m. on Saturday, September 2, 1978. He contends that this interference amounted to a violation of his sixth amendment right to counsel and tainted the subsequent confession of September 3. In this regard, he maintains that there were no intervening circumstances present which were sufficient to dissipate the taint of illegality caused by the police misconduct. Continuing, he asserts that since his September 4 statement was the fruit of the first illegally elicited statement, it too must be suppressed. Finally, the defendant argues that at no time did he waive his sixth amendment right to the assistance of counsel. Inherent in this contention is the assertion that the statements must be suppressed as independently violative of his sixth amendment right to counsel during police interrogation, since adversary judicial proceedings had already commenced.

■■ The sixth amendment right to counsel attaches at the time that adversary judicial criminal proceedings have been initiated against the accused, whether by way of formal charge, arraignment, preliminary hearing, information or indictment. (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239, citing *Kirby v. Illinois* (1972), 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82; accord, *People v. Burbank* (1972), 53 Ill. 2d 261, 271-72, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017.) This court in *People v. Hinton* (1974), 23 Ill. App. 3d 369, 372, held that a complaint followed by an arrest warrant and the actual arrest of the defendant amounts to a formal charge under the language of *Kirby v. Illinois* describing the kind of adversary judicial criminal proceedings which

vests the right to counsel. (Accord, *People v. Marshall* (1977), 47 Ill. App. 3d 784, 786; see *United States ex rel. Sanders v. Rowe* (N.D. Ill. 1978), 460 F. Supp. 1128, 1139; *People v. Huffman* (1980), 81 Ill. App. 3d 901, 909; *People v. McDonald* (1974), 23 Ill. App. 3d 86, 90 *aff'd* (1975), 62 Ill. 2d 448.) Here the defendant had been arrested and appeared before a judge at 9:30 a.m. on September 2, 1978, at which time the judge read him the complaint and the charges against him and informed him of his constitutional rights. Based on the cases cited immediately above and the fact that the defendant had appeared before a judicial officer, the defendant's sixth amendment right to counsel attached at the time he appeared before the judge.

Having disposed of this threshold inquiry, the question arises whether the defendant's sixth amendment right to counsel was infringed on September 2, 1978, when attorney Ellerby of the Spiezer law firm attempted to visit or consult with him.

Attorney Carol Ellerby, a partner in the Joseph Spiezer law firm, testified that she went to the Ogle County jail at approximately 3 p.m. on Saturday, September 2, 1978, to visit the defendant and Mary Smith. She spoke with the jailer, whom she believed was John Willard, and informed him that she had come to see Dan Smith and Mary Smith. He told her that she could not see the defendant because he was undergoing withdrawal and was shaking so hard he could not stay on the bed. She took out a business card and wrote on the back of it that she was Joe Spiezer's partner and the defendant was not to make a statement unless one of his lawyers was present. She gave the card to the jailer and asked him if he would see that the defendant received it; the jailer responded that he would do so. Attorney Ellerby did not see the defendant at any time on September 2.

Carol Ellerby then met with Mary Smith shortly after she was refused permission to visit the defendant. Ellerby testified that as of 3 p.m. the Spiezer law firm was representing Mary Smith. After visiting briefly with Mary Smith, Ellerby informed attorney Spiezer that she was not allowed to consult with the defendant. At approximatey 3:30 p.m., she returned to the jail with another partner of the Spiezer firm, Robert Thorsen, and attempted to see Mary Smith again. Ellerby and Thorsen met with Mary Smith at 4:30 p.m. and informed her that they did not represent the defendant and asked her if she wanted the Spiezer firm to represent her. Mary Smith responded that she was going to be represented by another attorney provided by her family.

Judge Moore testified that he met with attorneys Ellerby and Thorsen at their request on Saturday, September 2, 1978, at approximately 4. p.m. The judge stated that Thorsen informed him that the Spiezer law firm did not represent the defendant because he did not have any money.

Preliminarily, it should be noted that the trial court made a finding that the Spiezer law firm was representing the defendant as of 3 p.m. on September 2, although the trial court believed that such representation had been terminated an hour or so later after attorneys Ellerby and Thorsen met with Judge Moore. In addition, all the law enforcement officials who testified in this cause stated that the defendant was not undergoing heroin withdrawal on Saturday, September 2, and no valid reason was adduced at trial to explain or justify the denial of personal consultation between attorney Ellerby and the defendant.

■■ Given these facts, the jailer wrongfully interfered with the attorney-client relationship here. The question remains whether it was a wrongful interference which rose to the level of a constitutional infringement of the defendant's sixth amendment right to counsel such that the statements subsequently obtained from the defendant must be suppressed.

Relying on fourth amendment cases which have applied the taint analysis and suppressed evidence which was obtained after a violation of the defendant's constitutional rights (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254), the defendant contends that the statements he gave to Officer Messer approximately 24 hours after attorney Ellerby's attempted visit was the product of the unlawful interference with the attorney-client relationship and therefore must be suppressed, since no intervening circumstances occurred to dissipate the taint of the illegal police conduct. We believe that the fourth amendment precedent for requiring the exclusion of evidence tainted as a result of police conduct which abridges constitutional rights is equally applicable in the sixth amendment right to counsel area. See *United States v. Wade* (1967), 388 U.S. 218, 239-42, 18 L. Ed. 2d 1149, 1164-66, 87 S. Ct. 1926, 1939-40; *Maglio v. Jago* (6th Cir. 1978), 580 F.2d 202, 207; *United States v. Massey* (M.D. Fla. 1977), 437 F. Supp. 843, 861-62.

To determine whether there is a sufficient causal connection between the illegality and the subsequent confession given by the defendant on September 3 so as to require its exclusion from evidence, it is necessary to apply the test recently articulated in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. Thus, the court must consider the temporal proximity of the constitutional violation and the resultant confession, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct and whether *Miranda* warnings were given. *Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839-40, 99 S. Ct. 2248, 2259; *Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261; accord, *People v. McMahon* (1980), 83 Ill. App. 3d 137, 144.

We note that almost 24 hours passed between the time attorney Ellerby was denied permission to see the defendant on September 2 and the initiation of the questioning session with Officer Messer which resulted in the defendant's statement of September 3. There is no evidence in the record that the police attempted to question the defendant during this 24-hour hiatus. (*Cf. People v. James* (1980), 82 Ill. App. 3d 551, 558.) This is not a case where the police prevented the attorney from conferring with her client and then sought to exploit her absence by interrogating the defendant immediately after or shortly after she departed.

In addition, there were significant intervening circumstances which support the view that the causal connection between the police misconduct and the incriminating statement of September 3 was sufficiently attenuated to permit the use at trial of the statement.

The defendant was given the requisite *Miranda* warnings by Ogle County deputy sheriff Melvin Messer early on the morning of Saturday, September 2, 1978, and acknowledged that he understood the warnings and his constitutional rights; however, the defendant was unable to respond to Messer's questions in a logical or coherent manner at that time. At approximately 9:30 a.m. on that morning, he was taken before a judge who advised him of his right to remain silent, his right to the assistance of counsel during any interrogation or questioning, his right to a prompt preliminary hearing and the fact that there was no bond in his case. This judge's testimony was that the defendant's answers were responsive to his questions and that he appeared normal and was not sick or staggering. On September 3, 1978, at approximately 2:15 p.m., Officer Messer again advised the defendant of his constitutional rights as contained in the *Miranda* warnings, and the defendant told him that he understood his rights and that the officer didn't have to recite them. The defendant consented to give a statement and asked that it be recorded. Prior to the start of the formal statement, which took place from 2:35 p.m. to approximately 3 p.m. on that date, the defendant was allowed to meet with Mary Smith for 10 minutes or so. Following this conference with Mary Smith, he was again given the *Miranda* warnings and stated he understood them and was willing to talk about the case. He then gave the tape-recorded statement in question, in which he confessed that he committed the armed robbery and shot the victim, although he contended that the shooting was accidental.

At 9 a.m. on Monday, September 4, 1978, the defendant was examined by Dr. Srichai, who treated Dan Smith for heroin withdrawal and found him capable of reading, understanding and signing the tape-recorded statement of the previous day, which subsequently had been transcribed. At the request of the defendant, he was again permitted to

confer with Mary Smith. In Mary Smith's presence the sheriff again read the defendant the *Miranda* warnings and the defendant acknowledged he understood them. The defendant and Mary Smith went over the statement together, and the defendant made some corrections and asked for another statement form on which he added a brief statement in his own handwriting, in which he again implicated himself in the murder and armed robbery. Jerry Brooks, sheriff of Ogle County, testified that the defendant appeared normal but a little nervous and that no threats or promises had been made to the defendant. The defendant was not physically mistreated; nor did he complain at any time to the sheriff that he was being prevented from seeing a doctor.

The defendant testified that he took drugs on the morning of the murder of Clifty Davis and that he had been taking drugs throughout Friday, September 1, 1978, the day of his arrest. He stated that he had been using heroin on a daily basis for more than a year prior to his arrest but did not experience problems understanding what people were saying during the period of his drug abuse; he also believed he understood what the police officers were saying to him during the questioning which occurred on the morning of September 2, 1978. On Saturday morning, September 3, 1978, he asked an officer if he could immediately see a doctor. He also admitted that Officer Messer gave him the *Miranda* warnings on Sunday afternoon and that he understood them. He further testified that after he talked to Officer Messer for a few minutes on Sunday afternoon he asked Messer if he could see a doctor and that Messer informed him that he could see the doctor after he gave a statement, because the statement would not be any good if he gave it while under medication. Approximately 30 minutes after he had given the tape-recorded statement, he was visited by Dr. Warmolts, at which time he was given some Valium. He admitted that he did not mention to Dr. Warmolts that he had to confess to the instant offense in order to get an opportunity to see the doctor. In addition, he testified that on Monday morning, September 4, 1978, he was examined by Dr. Srichai and given medication as a result. Approximately one hour later, he met with Sheriff Brooks. At this time he was allowed to consult with Mary Smith; he then examined the eight-page typewritten statement he had orally given to Officer Messer the day before, made certain corrections and signed each page of the statement. He then requested a blank statement page, made an additional statement and signed it. The defendant further stated that he freely and voluntarily signed the statements and that nobody twisted his arm to get him to sign them.

We emphasize here that the defendant testified that he received the card containing the cautionary message which attorney Ellerby had given the jailer. Apparently the police forwarded from the attorney to the

defendant the cautionary message which had warned Dan Smith not to make any statements unless one of his attorneys was present. Although this message may not have been as effective, influential or forceful as a personal admonition, it is a significant event indicating both that the defendant did receive a warning from his attorney and that the police did not completely prevent the attorney from apprising or impressing upon her client that he should not make a statement in the absence of counsel. Furthermore, the police did grant the defendant's request to speak with Mary Smith before he gave the incriminating statement to Officer Messer on September 3. Given the evidence in this case, no inference or suggestion can be drawn from the record that law enforcement officials were engaged in a calculated plan to keep the defendant incommunicado until a confession could be extracted. Compare *Darwin v. Connecticut* (1968), 391 U.S. 346, 20 L. Ed. 2d 630, 88 S. Ct. 1488.

An additional factor which further insulated the defendant's September 3 statement from the unlawful police conduct on September 2 is the giving of the *Miranda* warnings before questioning and the defendant's waiver of his rights in response to the admonitions. While the *Miranda* warnings alone and *per se* are not sufficient to attenuate the taint of unconstitutional conduct (*Dunaway v. New York* (1979), 442 U.S. 200, 216-17, 60 L. Ed. 2d 824, 838-39, 99 S. Ct. 2248, 2258-59; *Brown v. Illinois* (1975), 422 U.S. 590, 601-03, 45 L. Ed. 2d 416, 426-27, 95 S. Ct. 2254, 2260-61), the giving of them is a significant factor favorable to the State's position when considered together with the other factors discussed above. Finally, from what has been said above, we believe that the conduct of the police was not purposely designed to infringe upon the defendant's sixth amendment right to counsel and was not of a flagrant nature.

■■■ Given the totality of the facts and circumstances of this case, we believe the causal connection between the police misconduct and the defendant's statement of September 3 was sufficiently attenuated to dissipate the taint of illegality. Accordingly, we determine that the statement of September 3 was not obtained as a result of the unlawful interference with the attorney-client relationship on September 2; similarly, the subsequent handwritten statement given to Sheriff Brooks on September 4 was not tainted by the prior police illegality. Thus, we conclude that the incriminating statements were properly admitted into evidence.

The defendant also contends that, in view of the totality of the circumstances surrounding the making of the tape-recorded statement on September 3, 1978, he did not knowingly waive his sixth amendment right to counsel. The determination of whether the accused knowingly, intentionally and intelligently waived the right to counsel depends on the particular facts and circumstances of the case, including the conduct,

background and experience of the accused, and a court will indulge in every reasonable presumption against the waiver of a constitutional right such as the right to counsel. (*People v. Blanchard* (1967), 37 Ill. 2d 69, 74; see *Brewer v. Williams* (1977), 430 U.S. 387, 404, 51 L. Ed. 2d 424, 440, 97 S. Ct. 1232, 1242; *People v. Petty* (1977), 54 Ill. App. 3d 1044, 1050.) Where the question of whether the defendant knowingly and voluntarily waived the right to counsel is raised in a motion to suppress, the reviewing court will not disturb the trial court's ruling unless it is contrary to the manifest weight of the evidence. *People v. Aldridge* (1980), 79 Ill. 2d 87, 94-95; *People v. Petty* (1977), 54 Ill. App. 3d 1044, 1050.

In this case, at the conclusion of the hearing on the motion to suppress, the trial court determined that the defendant had intelligently and knowingly waived his right to counsel under the sixth amendment and consequently the two statements admitted into evidence were not taken in derogation of his sixth amendment right to counsel. The trial court made a number of findings which are relevant to the sixth amendment issue of waiver: (1) that the defendant did not make any request, express or implied, to consult with a lawyer, including members of the Spiezer law firm, or to have a lawyer present before or during the making of the two statements at issue; (2) that he was not represented by an attorney between 4 p.m. Saturday afternoon, September 2, 1978, and Tuesday morning, September 5, 1978, and jail and police personnel were aware of this fact; (3) that he was fully and completely advised of his rights in accordance with the *Miranda* warnings prior to the making of both statements, that he understood the warnings and his rights each time he was advised of them and freely, voluntarily and intelligently waived these rights; (4) that at no time did he refuse to talk to the police; (5) that at no time prior to or during the giving of the oral statement of September 3 did the defendant request to see a doctor; (6) that the defendant was visited by a physician between the giving of the September 3 statement and the handwritten statement of September 4, 1978 (actually he was seen by two doctors during this time period); (7) that at no time immediately prior to or during the giving of the statements was the defendant under the influence of heroin or other drugs, suffering the effects of heroin withdrawal or other drug-induced incapacity or experiencing pain of sufficient magnitude to interfere with the exercise of his will; (8) that the defendant at no time was told or led to believe that he could see a doctor after he gave a statement or that he could not have medication because it might affect the validity of his statement; (9) that no promises were made to the defendant and no threats or force were directed against him; and (10) that the defendant had prior experience with the criminal justice system and was not exceptionally young or unintelligent.

■■ After a careful examination of the evidence in this case, in light of the

foregoing principles of law, we determine that there is ample evidence to support the findings of the trial court; that its findings are not against the manifest weight of the evidence; that the defendant did knowingly, intelligently and voluntarily waive his sixth amendment right to counsel and that his constitutional rights were not violated. See *United States v. Springer* (7th Cir. 1972), 460 F.2d 1344, 1351-53, *cert. denied* (1972), 409 U.S. 873, 34 L. Ed. 2d 125, 93 S. Ct. 205; *People v. Smith* (1969), 42 Ill. 2d 479, 482-83; *People v. Sandoval* (1976), 41 Ill. App. 3d 741, 743-45; *People v. Anthony* (1976), 38 Ill. App. 3d 427, 430-32; *People v. Kelley* (1973), 10 Ill. App. 3d 193, 196-97.

The defendant's second contention is that the exclusion of prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, resulted in the selection of a jury which was biased in favor of the prosecution on the question of guilt or innocence. His assertion is based upon the trial court's excusing for cause four prospective jurors who had expressed the conviction that they would not vote, under any circumstances, at sentencing to impose the death penalty against the defendant.

In support of his position, the defendant has cited three studies which he claims supply convincing evidence that a "death qualified" jury is conviction-prone or biased in favor of the prosecution on the issue of the defendant's guilt or innocence. Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process*, 84 Harv. L. Rev. 567 (1971); Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U. of Colo. L. Rev. 1 (1970); Boehm, *Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias*, 1968 Wisc. L. Rev. 734.

The court in *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, was presented with the same study conducted by Professor George Jurow which the defendant cites in his brief. It should be noted that the Jurow work itself contains a brief discussion and critique of the Boehm and Bronson studies which the defendant also relies upon in support of his position here. Although the court determined that the Jurow study was superior to former works, it rejected the defendant's contention that the study provided sufficient data to demonstrate that a jury empaneled in accordance with the requirements of *Witherspoon* is conviction-prone. (70 Ill. App. 3d 166, 172; accord, *People v. Rhinehart* (1973), 9 Cal. 3d 139, 155, 507 P.2d 642, 652-53, 107 Cal. Rptr. 34, 44-45.) A divided court in *Kirpatrick* found that Professor Jurow's study did indicate that a jury would have a very slight bias in favor of conviction if those persons who unalterably opposed the death penalty were excluded from the jury. But

the court also stated that the study itself admitted that such bias is ameliorated by the exclusion of prospective jurors who are disposed to impose the death penalty. Noting that highly death-penalty-prone jurors were excused during the *voir dire* in that case, the *Kirkpatrick* court concluded that the defendant had failed to demonstrate that the jury selection process there resulted in a conviction-prone jury. 70 Ill. App. 3d 166, 172.

Most recently in *People v. Carlson* (1980), 79 Ill. 2d 564, 586, the same three studies relied upon by the defendant here were called to the attention of our supreme court. Because of the nature of the issues before the court in the *Carlson* case, the court did not decide the validity of the studies in question but in *dictum* stated that these articles did support the defendant's assertion that a jury from which persons who opposed the death penalty were excluded would be more prone to find a defendant guilty.

It is not necessary that we determine the validity of these studies, since an examination of the jury selection in this case discloses that, as in *Kirkpatrick*, the highly death-penalty-prone jurors were actually excused during the *voir dire*. This procedure, in effect, eliminated those who, under the Jurow study, would have caused the selected jury to be biased in favor of conviction. Furthermore, the record in this case is replete with instances where veniremen were excused because they were admittedly unable to be impartial regarding the determination of the defendant's guilt or innocence. The record also indicates that all persons who were empaneled satisfactorily answered questions posed by the court to ascertain whether they could be impartial on the question of the defendant's guilt or innocence. In addition, it should be kept in mind that in a capital case the defendant, as well as the State, is granted 20 peremptory challenges which he may exercise if he is not satisfied with the impartiality of any prospective juror. (Ill. Rev. Stat. 1977, ch. 38, par. 115—4(e).) The defendant in this case has neither claimed nor demonstrated that he exhausted his peremptory challenges. A defendant's failure to exhaust his peremptory challenges indicates that defense counsel was of the opinion that the selected jury represented a fair and impartial trier of the facts. *Cf. People v. Sleezer* (1956), 9 Ill. 2d 57, 61; *People v. Black* (1970), 130 Ill. App. 2d 996, 1000, *aff'd* (1972), 52 Ill. 2d 544, 557, *cert. denied* (1973), 411 U.S. 967, 36 L. Ed. 2d 689, 93 S. Ct. 2155.

■■ Given the facts and circumstances of this case, we conclude that, even if we were to assume the validity of the aforementioned studies, the jury selection procedure here did not produce a jury biased in favor of the prosecution so as to deny the defendant a fair trial by an impartial jury.

Next the defendant asserts that section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par.

1005—8—1(a)(1)), the sentencing provision providing for a term of natural life imprisonment, does not expressly require the trial court to consider the goal of restoring the offender to useful citizenship in accordance with the mandate of article I, section 11, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §11) and consequently the sentencing section is unconstitutional on its face. This contention lacks merit.

Article I, section 11, of the Illinois Constitution of 1970 provides:

"All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.)

It has been judicially recognized that the language of this provision imposes a constitutional requirement that the accused's rehabilitative potential be considered in fixing sentences. (*People v. LaPointe* (1980), 85 Ill. App. 3d 215, 222-23, *appeal allowed* (1980), 82 Ill. 2d 586; *People v. Kane* (1975), 31 Ill. App. 3d 500, 512.) Our supreme court has consistently recognized and applied the aforementioned constitutional mandate and has determined that, for the purpose of sentencing, the spirit and objective of the law are upheld when the sentence reflects both the seriousness of the offense and the defendant's potential for rehabilitation. *People v. Carlson* (1980), 79 Ill. 2d 564, 587; *People v. Murphy* (1978), 72 Ill. 2d 421, 439.

The Illinois Supreme Court has also stated that the general purpose of the Unified Code of Corrections is to rehabilitate the offender, if possible, and to restore him to useful citizenship. (*People v. Mahle* (1974), 57 Ill. 2d 279, 285.) This purpose or objective of rehabilitation is expressly set forth in section 1—1—2(d) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1001—1—2(d).) More recently, the court in *People v. Perry* (1980), 81 Ill. App. 3d 422, 431, rejected a challenge to the constitutionality of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1001—1—1 *et seq.*), which was based on the ground that the legislature, in enacting the new Code, effectively abandoned the concept of rehabilitation as an objective of sentencing in violation of article I, section 11, of the Illinois Constitution of 1970.

■■ Thus, it is manifest that both article I, section 11, of the Illinois Constitution and section 1—1—2 of the Unified Code of Corrections mandate that the trial court consider the rehabilitative potential of the defendant in determining whether to impose a term of natural life imprisonment under section 5—8—1(a)(1) of the Code. Contrary to the defendant's assertion, section 5—8—1(a)(1) does not permit the court to impose a sentence of natural life imprisonment solely on the basis of the nature or seriousness of the offense committed. Furthermore, no other sentencing provision of the Unified Code of Corrections expressly

requires the consideration of a defendant's rehabilitative potential, and the defendant's argument would naturally lead to the untenable conclusion that all prison sentences imposed in Illinois are therefore violative of the constitutional mandate of article I, section 11.

The defendant also maintains that the trial court contravened the express mandate of article I, section 11, of the Illinois Constitution of 1970 when it sentenced him to life imprisonment under section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(1)) without expressly finding that the defendant was devoid of rehabilitative potential.

The basic premise of the defendant's constitutional challenge is that the trial court is required to find that the defendant totally lacks the potential to be restored to useful citizenship before a term of natural life imprisonment may be imposed upon him. The defendant relies upon the following language in this court's opinion in *People v. LaPointe* (1980), 85 Ill. App. 3d 215, *appeal allowed* (1980), 82 Ill. 2d 586:

> "* * * [T]here is no indication that [the trial judge] made any analysis as to the possibility that defendant could at some future date be restored to useful citizenship. Certainly the sentence imposed infers that he deemed that there was no such possibility in this case; however, since a natural life sentence utterly rejects the possibility of rehabilitation, such a conclusion should have been supported by facts and findings. The trial judge did find that neither defendant's attitude nor the likelihood of the offense reoccurring mitigated the term of years he was to impose; however, at no time did the judge weigh these factors in terms of restoring defendant to useful citizenship at some time in the future." (Emphasis added.) (85 Ill. App. 3d 215, 223.)

While it may be possible to read the language of *LaPointe* to support the defendant's contention here, our decision in that case should not be construed in so broad a manner. Rather, *LaPointe* was intended to make clear that the trial judge must weigh and give consideration to the rehabilitative potential of the defendant as well as the nature and seriousness of the offense committed in determining the imposition of any sentence, including that of natural life, and the record must disclose that the judge did give such consideration to both elements. In *LaPointe*, we determined the record was devoid of any indication that the trial court had considered the defendant's potential for rehabilitation; there we were merely stating that no inference of such consideration could be drawn from the sentence imposed because of the nature of that particular sentence, namely, natural life.

The next issue which the defendant raises is that the trial court erred in imposing a natural life term upon him without first stating on the record

its findings regarding the possibility of restoring him to useful citizenship at some future date. Under section 5—4—1(c) and 5—8—1(b) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, pars. 1005—4—1(c), 1005—8—1(b)), the trial judge is required to specify on the record the particular evidence, information, mitigating and aggravating factors or other reasons which led to the sentencing determination. The purpose of requiring the statement of reasons is to eliminate speculation regarding the trial court's rationale and to provide the appellate court an adequate basis for review of the sentence (*People v. Taylor* (1980), 82 Ill. App. 3d 1075, 1077), thereby allowing the reviewing court to determine whether the basis for the sentencing decision is in conformance with the statutory purposes embodied in the Code of Corrections (*People v. Bishop* (1980), 81 Ill. App. 3d 521, 523).

At the sentencing hearing in the present case, the trial judge stated in detail his reasons for sentencing the defendant to a term of natural life imprisonment. His statement of reasons for sentencing did not expressly include an analysis or finding regarding the possibility of restoring the defendant to society as a useful citizen. Likewise, although the trial court did discuss factors in aggravation and mitigation, there is no express indication in the sentencing hearing record that the court weighed these factors in terms of determining the rehabilitative potential of the defendant.

However, we note that evidence was presented to the court in support of the defendant's rehabilitative potential. Immediately prior to the sentencing hearing, the court conducted a hearing to determine whether the death penalty would be imposed. During the death penalty hearing, defense counsel argued that the defendant had the potential for rehabilitation and could do productive work to benefit society while incarcerated, if his life were spared. The parties stipulated that the trial court could consider all the evidence presented at trial and all matters presented to the court during the death penalty hearing in reaching a sentencing decision. It is also apparent from the record that the court was fully informed on the defendant's recent religious experiences while incarcerated during trial and before sentencing, since three witnesses testified to the new emphasis of religion in the defendant's life and the sincerity with which he held his beliefs. Also, the trial court considered the presentence report and had evidence before it regarding the defendant's character, history and family relationships, which were relevant factors to be taken into account by the court in evaluating the defendant's potential for rehabilitation. The court considered the above evidence during the hearing on the death penalty when it determined not to impose capital punishment. We are convinced that the court likewise considered and evaluated the same evidence and arguments in support of the defendant's

potential for rehabilitation during the subsequent sentencing hearing itself.

■■ Furthermore, as our supreme court recently stated in *People v. Meeks* (1980), 81 Ill. 2d 524, 534, "[t]he requirement that the trial judge set forth his reasons in the record for the particular sentence imposed does not obligate the judge to recite, and assign a value to, each fact presented in evidence at the sentencing hearing." An analysis of the record in this case discloses the basis and reasons which led to the sentencing determination. We conclude the trial court sufficiently complied with the requirements of the Unified Code of Corrections.

The defendant further argues that the sentence imposed by the trial court was excessive and therefore constituted an abuse of discretion.

■■ During the sentencing hearing, the trial court made the following statement, which is supported by the evidence in this case:

"* * * [T]his particular murder reflects a cold, calculated plan in which the defendant entered a tavern, confronted the owner, whom he knew and who knew him, threatened her with a gun, demanded and took money, took her hostage from the tavern in her own car, drove with her on the floor of the car with a gun at her head past a prearranged point from whence he was followed by his accomplice, Mary Smith, to an isolated rural location where he shot Clifty Davis at least four times and possibly five times in the head. By his own statement, he indicates that his first shot did not kill her and he then proceeded to fire the remaining shots."

We point out also that the defendant used a single-action revolver which necessitated that he pull the hammer back manually and squeeze the trigger before firing each additional round. Mary Smith's testimony at trial indicated that the defendant was aware that the victim had recognized him and that he shot her because she had recognized him. While the evidence in this case may indicate that the defendant had some potential for rehabilitation, given the nature and seriousness of the offense as well as the manner in which it was committed, we conclude that the trial court struck a proper or equal balance between the factors of deterrence or punishment, on the one hand, and rehabilitation on the other. (See *People v. Waud* (1977), 69 Ill. 2d 588, 596.) The sentence reflects the gravity of the crime and gives sufficient consideration to the defendant's potential for rehabilitation. Accordingly, the defendant has failed to demonstrate that the trial court abused its discretion in imposing sentence. *People v. Cox* (1980), 82 Ill. 2d 268; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153.

■■ We also reject the defendant's contention that, since the trial court earlier found factors in mitigation sufficient to preclude the imposition of the death penalty, these same factors consequently required the court below to conclude that a term of life imprisonment was likewise

improper. Given the singular nature of the death penalty, we believe the trial court may properly view certain factors as sufficiently mitigating so as to preclude the imposition of the death penalty and at the same time find the same factors insufficient to prevent the imposition of a term of life imprisonment. In addition, we believe our recent decision in *People v. LaPointe* (1980), 85 Ill. App. 3d 215, *appeal allowed* (1980), 82 Ill. 2d 586, upon which the defendant relies here, is distinguishable from the case at bar. Unlike the 18-year-old defendant in *LaPointe*, who did not have a significant history of prior criminal activity and who had never before engaged in violent conduct, the defendant in this case has a significant history of prior criminal conduct, both as a juvenile and adult, has previously committed crimes involving the use of violence and has frequently displayed aggressive behavior. Nor do we believe that the evidence of the defendant's history of drug use and the conflicting evidence regarding his use of drugs on the day of the murder warrants the conclusion that the trial court abused its discretion in imposing the natural life sentence. See *People v. Nobles* (1980), 83 Ill. App. 3d 711, 717.

The defendant likewise maintains that section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1) denies him due process and equal protection of the law in violation of both the Federal and State constitutions. (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. 1, §2.) At the outset it should be noted that the defendant, as far as we can determine, has not advanced any due process argument in his brief. Since the defendant has failed to comply with the standards fixed by Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1979, ch. 110A, par. 341(e)(7)), he has waived this issue. *Hillblom v. Ivancsits* (1979), 76 Ill. App. 3d 306, 312-13; *People v. Jimerson* (1979), 69 Ill. App. 3d 403, 412-13.

With respect to the defendant's equal protection claim, he argues that he is being denied equal protection of the law because he is among a class of offenders who are sentenced to imprisonment without the possibility of returning to society while all other noncapital offenders are returned to society. The defendant's contention is unfounded.

In determining whether a legislative classification contravenes the equal protection clause, the classification is presumed valid, and the party challenging it bears the burden of demonstrating its invalidity. (*People v. McCabe* (1971), 49 Ill. 2d 338, 340.) The equal protection clause does not deny the State the power to treat different classes of persons in different ways. (*People v. Bradley* (1980), 79 Ill. 2d 410, 416.) The State may use its power to classify in the exercise of the police power without violating the equal protection clause as long as there is a reasonable and rational basis to justify the classification. (*People v. McCabe* (1971), 49 Ill. 2d 338, 340-41; see *People v. Collins* (1978), 57 Ill. App. 3d 934, 938.) And the

equal protection clause recognizes that the legislature has a broad latitude and discretion in classifying. (*People v. McCabe* (1971), 49 Ill. 2d 338, 341.) It is also well established that, once the legislature decides that an evil exists and determines what measures are necessary to discourage or prevent it, the legislative enactment will not be disturbed unless it manifestly contravenes a constitutional limitation. *People v. Houston* (1976), 43 Ill. App. 3d 677, 681.

■■ In light of the above criteria, we determine that a rational basis exists to justify the imposition of the term of natural life imprisonment upon certain offenders whose crimes are particularly heinous or brutal. We believe the State has a legitimate right and need to protect society, in a permanent way, against a class of murderers who have demonstrated that they are capable of committing acts indicative of wanton cruelty; and the sentence of life imprisonment without the prospect of future release is reasonably designed to remedy the evil. Since individuals who perpetrate heinous murders form a distinct class of offender, the State, in the reasonable exercise of its police power, may classify and treat them as a separate and distinct group. The defendant has failed to establish the invalidity of section 5—8—1 of the Unified Code of Corrections.

The defendant's final contention is that his sentence of natural life imprisonment without the possibility of future release is cruel and unusual punishment in violation of the eighth amendment to the United States Constitution. (U.S. Const., amend. VIII.) We find this assertion unpersuasive. Both the United States Supreme Court (*e.g., Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909) and the Illinois Supreme Court (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 540-43) have rejected cruel and unusual punishment challenges to the death penalty. The defendant makes no attempt in his brief to inform the court why the sentence of natural life imprisonment should be viewed as cruel and unusual punishment when the death penalty, which differs from all other types of sanctions in its finality, has been upheld against eighth amendment challenges.

We also note that in *Schick v. Reed* (1974), 419 U.S. 256, 267, 42 L. Ed. 2d 430, 439, 95 S. Ct. 379, 385, the Supreme Court sustained the commutation of a death sentence to life imprisonment without parole, stating that:

> "The no-parole condition attached to the commutation of [petitioner's] death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or *statutes otherwise precluding parole; it does not offend the Constitution.*" (Emphasis added.)

Furthermore, numerous cases have upheld a sentence of life imprison-

ment without parole against the challenge that such a sanction constitutes cruel and unusual punishment in contravention of the eighth amendment. (*Moore v. Cowan* (6th Cir. 1977), 560 F.2d 1298, 1302-03, *cert. denied* (1978), 435 U.S. 929, 55 L. Ed. 2d 525, 98 S. Ct. 1500; *McGinnis v. State* (Ala. Crim. App. 1979), 382 So. 2d 605, 608; *State v. Farrow* (1978), 118 N.H. 296, 303, 386 A.2d 808, 812-13; *State v. Dunlap* (1979), 298 N.C. 725, 735-36, 259 S.E.2d 893, 898-99; *State v. Forrester* (1978), 21 Wash. App. 855, ___, 587 P.2d 179, 188-89.) The defendant has not directed us to, nor have we found, any case which holds that the imposition of a term of life imprisonment for the offense of murder constitutes cruel and unusual punishment. We conclude that the defendant's term of natural life imprisonment without the possibility of future release does not constitute cruel and unusual punishment.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

NASH and WOODWARD, JJ., concur.