THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JESSE GOODMAN, Defendant-Appellant.

Second District    No. 80-251

Opinion filed July 16, 1981.—Rehearing denied September 1, 1981.

William R. Beu, of Rockford, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Jesse Goodman, was charged on January 2, 1980, with two counts of murder, and one count of armed robbery. (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2, 9—1 and 9—1(a)(3).) Following a jury trial in the Circuit Court of Winnebago County, defendant was found guilty of both charges and sentenced to natural life for murder and six years for armed robbery. Defendant appeals.

At trial, the following evidence was introduced. Charles McGavran, who had known the decedent, Dale Helgeson, for several years, testified that on the evening of July 20, 1979, he was at the Tenstopet Tavern in Rockford, Illinois, and observed the defendant playing pool. He did not recall seeing the defendant much later than 8 p.m., but in an hour or so prior to that time he observed defendant and another man buying drinks back and forth. At about 10 p.m., McGavran found the decedent on the floor in the bathroom of the tavern. He later identified the defendant from a group of photographs provided by the Rockford police.

Dr. Richard Novack testified that an autopsy he performed on Dale Helgeson revealed ten stab wounds over the body as well as facial lacerations. The cause of death was determined to be a stab wound which penetrated the heart. The doctor noted that a toxology performed on the decedent indicated sufficient blood alcohol to show a substantial degree of intoxication. Helegeson was also found to be clutching fragments of long black hair.

The wife of the decedent, Arlene Helgeson, testified that her husband was paid by his employer every Friday, and that he usually had a savings bond taken out of his check on the last Friday of each month and given to him. She stated that because she and her husband had been on vacation the first two weeks in July, he had not picked up the bond from June. She also testified that her husband would sometimes leave money

on the bar and then stick it in his shirt pocket when he left. However, she admitted that she was not with him on the night in question.

The State's key witness was Mary Stromblad. She testified that at the time of the incident she was defendant's girlfriend, and lived with him, her 10-year-old son, and defendant's brother, Andrew Goodman, in a trailer. On the day of the incident she stated that Jesse and Andrew Goodman left the trailer and returned about midnight. They then went into the bathroom for approximately 20 minutes, from which she heard sounds of running water and whispering. When they came out, Andrew Goodman suggested that the three of them go for a ride. Mrs. Stromblad testified that when the defendant came out of the bathroom he was wearing different clothes than the t-shirt he had come in with. While driving to Rockton later that night, she stated that the three of them heard a report on the radio about a murder at the Tenstopet Tavern. She testified that upon hearing the report, defendant told her that it was he who had committed the murder, and that he hadn't meant to do it but did so because the deceased had a hold of his hair and wouldn't let go. She further testified that the defendant told her that he took a wallet from the decedent containing a couple of hundred dollars and some bonds.

Mary Stromblad identified a dark-colored knife as the weapon that the defendant told her was used to kill the decedent. She testified that the day after the incident the defendant could not wear his boots because he had broken his toes. Near the close of her testimony on direct examination, Mrs. Stromblad specifically related what the defendant had told her concerning the incident. She stated that he said:

> "* * * that he went to the Tenstopet Tavern and he went inside the bathroom and he was fighting with Dale Helgeson and he had a hold of Jesse's hair and he wouldn't let go and they were fighting in there and he stole his wallet and he stabbed him a lot of times."

At the conclusion of her testimony on direct examination, she said that the reason the defendant went into the bathroom was to rob Dale Helgeson and that he had broken his toes while fighting with Dale Helgeson.

I

Just before the defense began its case the trial judge held a conference with counsel concerning jury instructions. At this conference, defense counsel indicated his desire to submit a manslaughter instruction. The court informed defense counsel that he would not accept any instructions concerning the offense of manslaughter, but urged counsel to submit the instruction for the record if he so desired. Defendant now argues that the trial court's refusal to accept manslaughter instructions constitutes reversible error.

■■ ■ As a preliminary matter, the State contends that the question is waived. First, defendant failed to include this claim in his written post-trial motion. The failure to raise an issue in the post-trial motion generally waives appellate consideration of such issue. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Secondly, the State argues that defendant waived the error by failing to tender any instructions on voluntary manslaughter. Both Supreme Court Rule and recent case law make it quite clear that where a defendant fails to tender an instruction he may not complain on appeal of the failure of the trial court to give that instruction. (Ill. Rev. Stat. 1979, ch. 110A, par. 366(b)(2)(i); *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Wolski* (1980), 83 Ill. App. 3d 17, 403 N.E.2d 528.) Although it is true that the court indicated in advance that it would refuse a manslaughter instruction, the court specifically asked defense counsel to submit such instruction for the record. Defense counsel agreed, but later failed to do so.

■■ ■ Nevertheless, in criminal cases the waiver rule will not prevent review of plain error affecting substantial rights where the interests of justice so require. (*People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513.) Our supreme court has held that in homicide cases, if there is evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining that crime should be given if requested. (*People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756.) Even where the trial court properly refuses erroneous instructions, it must instruct *sua sponte*. (50 Ill. 2d 302, 306, 278 N.E.2d 756, 759.) Furthermore, an instruction should be given even though the theory of defense at trial, as here, is inconsistent with the defendant's culpability for the lesser offense. *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497.

Even if the error was not waived, the State maintains that the evidence was insufficient to require an instruction on the lesser offense of manslaughter.

Defendant contends that there was sufficient evidence to support an instruction under either of the two branches of voluntary manslaughter. The statute provides:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, * * *

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would

justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1979, ch. 38, par. 9—2.

Under the first part of this statute, one type of conduct recognized as serious provocation is mutual quarrel or combat. (*People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451; *People v. Hammock* (1979), 68 Ill. App. 3d 34, 385 N.E.2d 796.) In support of defendant's claim that the provocation here consisted of mutual combat and quarrel, counsel cites evidence of black hair found clutched in the hands of the decedent, and in his mouth; the intoxication of the decedent; the inconsistent testimony of Mary Stromblad as to whether defendant admitted entering the bathroom at the tavern with the intent of robbing the decedent; and evidence that defendant's toes were broken during the incident.

Defendant relies heavily on *People v. Leonard* (1980), 80 Ill. App. 3d 741, 400 N.E.2d 568, to demonstrate how little evidence of mutual combat is needed to entitle a defendant to an instruction on manslaughter. In *Leonard*, the only competent evidence concerning the incident was that of three eyewitnesses who stated that they observed the defendant and the decedent, a building security guard, struggling for control of a handgun. They heard a shot and saw the security guard stumble backward and fall from a balcony. None of the witnesses saw blows exchanged. After the guard fell from the balcony, the defendant was heard to yell "Die, m_____ f_____, die" about five or six times. Further, there was evidence that defendant's lip was split, and that his hand and head were lacerated.

The court held that an instruction on voluntary manslaughter should have been given. In doing so, it rejected the State's argument that the decedent's struggle was, as a matter of law, a defensive response to an unprovoked, lethal assault by the defendant. (*People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131, *cert. denied* (1972), 409 U.S. 914, 34 L. Ed. 2d 175, 93 S. Ct. 247.) The court explained that unlike *Handley*, where the victim had been beaten by a gang of four assailants for more than 20 minutes, *Leonard* was a "one on one" situation. The sufficiency of the provocation was therefore to be determined by the jury.

Significantly, the court in *Leonard* found that there was no competent evidence to show how the fight began or what had preceded it. In our case, however, although it too was a one-on-one struggle in which there was evidence of combat (the pulled hair, the broken toes), there is the additional evidence of robbery which was absent from *Leonard*. As the State persuasively argues, the law will not countenance as adequate provocation a victim's physical resistance to an armed robbery initiated by the defendant. See, *e.g., People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15.

■■ This argument is also advanced in opposition to defendant's contention that, under the second branch of the manslaughter statute, the defendant killed the decedent while under the unreasonable belief that he was justified in doing so. This charge is made subject to the provisions of article 7 of the Criminal Code. Section 7—4 provides:

"The justification described in the preceding Sections of this Article is not available to a person who:

(a) Is attempting to commit, committing, or escaping after the commission of, a forcible felony." (Ill. Rev. Stat. 1979, ch. 38, par. 7—4.)

If, therefore, the defendant was found to have been committing an armed robbery at the time he killed the decedent, he could not avail himself of section 9—2(b) of the voluntary manslaughter statute; nor could the victim's resistance to the robbery be regarded as legally sufficient provocation for purposes of section 9—2(a) of the statute. It is true that where, as here, there are no eyewitnesses to the crime and the evidence is otherwise conflicting as to how the struggle began, it is generally for the jury with the benefit of proper instructions to decide whether the killing was murder or manslaughter. (*People v. Dortch* (1974), 20 Ill. App. 3d 911, 314 N.E.2d 324.) But in light of the verdicts returned by the jury in our case, we find that the trial court's failure to issue manslaughter instructions was harmless error.

The defendant was charged in three counts. He was charged with one count of armed robbery and two counts of murder—one count of "intent to kill or do great bodily harm" (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)), and one count of felony murder based on the armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)). The jury returned a verdict of guilty of armed robbery, and a general guilty verdict of murder. Defendant here has not challenged the sufficiency of the evidence in support of his conviction of armed robbery. In light of our discussion above, this verdict precludes, in a matter of law, a finding of voluntary manslaughter. The trial court's failure to issue manslaughter instructions was therefore harmless error. See *People v. Weathers* (1974), 18 Ill. App. 3d 338, 309 N.E.2d 795.

## II

Defendant's second assignment of error is that the trial court failed to consider his rehabilitative potential in sentencing him to a term of natural life. Because of this omission, defendant claims that the sentence imposed was excessive.

At the sentencing hearing, defendant waived his right to a jury and the State reaffirmed that it was seeking the death penalty. In accordance with the statute, the trial court considered factors in aggravation and

mitigation which were relevant to the imposition of the death penalty. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b), (c).) It found as a mitigating factor that the defendant acted under the compulsion of threat or menace of immediate infliction of death or great bodily harm. The court held this factor sufficient to preclude imposition of the death sentence. Pursuant to section 9—1(h) of the statute, the court then considered a term of imprisonment.

The record recites that the trial court found in aggravation that the murder was committed in the course of a felony, and was accompanied by brutal or heinous behavior indicative of wanton cruelty. With no further recitation of facts of findings, the defendant was sentenced to imprisonment for a term of natural life. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).

Section 5—5—3.1 and 5—5—3.2 of the Unified Code of Corrections set forth the factors in mitigation and aggravation which must be applied and accorded appropriate weight in favor of reducing or increasing a sentence of imprisonment. Although some of the factors are identical to those considered by the trial court in weighing the death penalty, the two lists are not entirely duplicative. In particular, defendant contends that it was error for the court to fail to indicate on the record that it considered whether there were substantial grounds tending to excuse or justify defendant's criminal conduct, though falling short of a defense. Ill. Rev. Stat. 1979, ch. 38, par. 1005—5.3.1(a)(4).

The presentence report, which was before the court, indicated that during the months immediately prior to his arrest, the defendant drank on a daily basis, experienced blackouts on several occasions and was physically dependent on alcohol. The defendant's parole officer stated that although the defendant reported to the parole office as scheduled, he lost several jobs due to excessive drinking. The officer also stated in the report that he was of the opinion that the defendant was unable to function in the community because of alcohol abuse.

The presentence report revealed that the defendant entered an alcoholic treatment program at the Veterans Hospital in North Chicago, Illinois, in June of 1979, about a month before the commission of the offense. However, defendant did not complete the treatment as he failed to return from a pass only 10 days before the commission of the crime. The discharge summary written by one of the doctors at the Veterans Hospital stated that as a result of defendant's drinking he had lost his home and job and had suffered blackouts and shakes. The doctor's report also indicated that the defendant had demonstrated in the past that he could not manage his life with alcohol. The defendant was discharged irregular on July 7, 1979, and the prognosis was poor. In the 10 days

between the irregular discharge from the Veterans Hospital and the commission of the crime, the defendant resumed out-patient counseling for his alcohol problem through Keyway in Rockford, Illinois.

In addition, a psychiatric report prepared by the court-appointed psychiatrist, Dr. Graybill, stated that the defendant told him that although he had been instructed by his attorney not to discuss the actual incident, the defendant and his brother had been drinking rather heavily on the night of the incident. This statement was confirmed by testimony at the trial that the defendant was drinking both before and after the commission of the crime.

Nothing in the record indicates that the trial court considered this evidence in mitigation, although it was presented to the court. The significance of alcohol dependence as a mitigating factor in the sentencing proceedings was emphasized in the case of *People v. Walcher* (1969), 42 Ill. 2d 159, 246 N.E.2d 256. In *Walcher* the supreme court reduced a death sentence to imprisonment from 40 to 65 years in a murder case where the defendant was an alcoholic and there was evidence that he had been drinking at the time of the murder. The court found that the defendant had prior arrests which were related to drinking, that he received an undesirable discharge from the army because of drunkenness and disorderly conduct, that the defendant had been voluntarily institutionalized four years prior to the commission of the crime for alcoholism, and that there was evidence of drinking before and after the commission of the crime. It is also noteworthy that the sentence which was reduced was one for a murder which occurred during the commission of a felony.

In a more recent case, *People v. LaPointe* (1980), 85 Ill. App. 3d 215, 407 N.E.2d 196, this court reduced a life sentence to a determinant term of 60 years. In that case there was testimony that the defendant was heavily involved in drugs, but it was disputed whether he was under their influence earlier on the day of the commission of the crime. The court in reducing the life sentence noted: "While, in any event, drug dependence would not excuse the defendant's act, the above-cited [case] [*People v. Walcher*] recognizes that such dependence is a factor to consider in sentencing even in a murder case." 85 Ill. App. 3d 215, 222, 407 N.E.2d 196, 203.

Section 5—4—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(c)) provides:

> "In imposing a sentence for a felony, the trial judge shall specify on the record the particular evidence, information, factors in mitigation and aggravation or other reasons that led to his sentencing determination. The full verbatim record of the sentencing hearing shall be filed with the clerk of the court and shall be a public record."

The purpose sought by the legislature in enacting this provision was to eliminate speculation regarding the basis of the trial court's sentencing decision, so as to enable a reviewing court to more intelligently determine whether the sentence was properly predicated upon statutory criteria. *People v. Taylor* (1980), 82 Ill. App. 3d 1075, 403 N.E.2d 607; *People v. Choate* (1979), 71 Ill. App. 3d 267, 389 N.E.2d 670; *People v. Meeks* (1979), 75 Ill. App. 3d 357, 393 N.E.2d 1190, *rev'd on other grounds* (1980), 81 Ill. 2d 524, 411 N.E.2d 9.

Furthermore, it is well established that both article I, section 11 of the Illinois Constitution of 1970, as well as section 1—1—2(d) of the Unified Code of Corrections, require that the rehabilitative potential of the accused in a felony case be considered in fixing sentence. (See *People v. Smith* (1980), 91 Ill. App. 3d 438, 414 N.E.2d 1281, and cases cited therein.) Our supreme court has stated that the spirit and objective of the law are only served when the sentence reflects both the seriousness of the offense and the accused's potential for rehabilitation. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

In the case before us, the only findings made by the trial court were in aggravation: that the murder was committed in the course of a felony, and was accompanied by brutal or heinous behavior indicative of wanton cruelty. It also noted that defendant had a prior criminal record. Although there was considerable evidence in the record relevant to the possibility that the defendant could at some future date be restored to useful citizenship, there is simply no indication that the trial court actually considered this evidence in determining sentence. The presentence report showed that the defendant had earned his GED and had completed programs in the area of drafting, machine operation, and horticulture while in prison for a prior conviction. The presentence report also reflected that the defendant had earned 47 hours of college credits while previously incarcerated and that he hoped to further his college education. Dr. Graybill in his psychiatric report found that the defendant is of above normal intelligence, and Dr. Hamann in a separate report stated that the defendant is of good average intelligence and was cooperative.

The State contends that this case should be controlled by our decision in *People v. Smith*. In *Smith*, we noted that the supreme court in *People v. Meeks* (1980), 81 Ill. 2d 524, 411 N.E.2d 9, held that the requirement that a trial court set out its reasons for imposing a sentence does not obligate the court to recite and assign a value to each factor presented at the hearing. In *Smith*, the trial court in the death-penalty phase of the sentencing hearing read the presentence report and heard argument with respect to both the defendant's rehabilitative potential and the seriousness of the crime. The court stated in detail its reasons for sentencing the defendant to a term of natural life, and discussed factors in aggravation and miti-

gation. Although the record reflected that the trial judge only considered evidence of the defendant's rehabilitative potential during the death penalty phase of the hearing, this court was convinced from the totality of the record that the trial court "likewise considered and evaluated the same evidence and arguments in support of the defendant's potential for rehabilitation during the subsequent sentencing hearing itself." *Smith*, 91 Ill. App. 3d 438, 451-52, 414 N.E.2d 1281, 1293.

*Smith* thus stands for the proposition that if the record reflects that the trial court considered mitigating factors and the rehabilitative potential of the defendant at the death penalty phase of a sentencing hearing, a reviewing court may fairly assume, unless shown otherwise, that those same factors were considered in deciding the final term of sentence. We do not read *Smith*, however, as dispensing altogether with the statutory and constitutional requirement that the trial court affirmatively indicate in the record that it has considered mitigation factors and rehabilitative potential at some stage of the sentencing proceeding. Nor should the supreme court's decision in *Meeks* that not every fact in evidence need be recited and assigned a value be construed to mean that no recitation of mitigation and rehabilitation evidence is ever necessary. Such a rule would, in some cases, compromise the appellate process by substituting mere speculation for informed judicial review of the basis for a trial court's sentence. Moreover, it would render even more difficult our task of determining whether the lower court abused its discretion. As the cases cited earlier in this opinion persuasively demonstrate, the requirement of disclosure on the record was meant to facilitate, not impede this inquiry.

This dilemma is particularly acute in cases such as that at bar where a sentence of natural life is supported by few findings and no discussion by the trial court of factors in mitigation or rehabilitative potential, despite considerable evidence of both in the record. Under similar facts, this court recently held:

"* * * since a natural life sentence utterly rejects the possibility of rehabilitation, such a conclusion should have been supported by facts and findings." (*People v. LaPointe* (1980), 85 Ill. App. 3d 215, 223, 407 N.E.2d 196, 203.)

Although *People v. Smith* clarified our holding in *LaPointe* by emphasizing that the sentencing court must consider both rehabilitative potential as well as the nature and seriousness of the offense, our commitment to the requirement that the record clearly indicate consideration of these factors remains undisturbed.

■■ Certainly, the trial court's sentencing decision is entitled to great deference. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Nevertheless, we find that the lower court here abused its discretion by

failing to adequately demonstrate on the record that it considered the proper criteria in passing sentence.

Accordingly, we affirm defendant's conviction of murder and armed robbery, but reverse the sentence and remand to the Circuit Court of Winnebago County for a new sentencing hearing consistent with this opinion.

Affirmed in part, reversed in part, and remanded with directions.

SEIDENFELD, P. J., and UNVERZAGT, J., concur.