THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY FLETCHER, Defendant-Appellant.

Third District No. 75-100

Opinion filed July 29, 1976.

538

STOUDER, J., specially concurring.

Robert Agostinelli and Mark Burkhalter, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (James E. Hinterlong, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE STENGEL delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and indecent liberties with a child. Consecutive sentences of 50-150 years for murder and 40-120 years for indecent liberties were imposed. The issues presented to this court are whether the evidence is sufficient to prove defendant's guilt beyond a reasonable doubt, whether results of a polygraph examination taken by defendant were improperly excluded and whether the trial court erred by refusing to give second paragraph of IPI—Criminal No. 3.02.

The State's evidence showed that on April 19, 1973, Shirley McCune, age 13, was babysitting at the Karen Gentile residence in Sparland, Illinois. Miss McCune's grandmother talked with her by telephone at 10:30 p.m. On April 21, 1973, Miss McCune's body was found in a cemetery in Peoria. The body, which was wrapped in two blankets, was nude from the waist down and her brassiere was cut in front. Medical examination revealed a fractured skull and other bruises, but death was caused by strangulation due to a sash which was looped around her neck. A vaginal swab revealed the presence of intact sperm. The time of death was not accurately determined; however, the examining physician stated that the body could not have lain in the position in which it was found for more than 18 hours.

While the victim was babysitting, Karen Gentile and two male

companions, Williams and Denmark, had been drinking in a bar in Lacon, Illinois, during the evening of April 19. Williams testified that he saw defendant playing pool in the Lacon bar around midnight, although Williams had been unable to identify defendant from a series of photographs shown to him prior to trial. The three drove to Peoria to continue drinking and, after arriving in Peoria at 4 a.m. April 20, 1973, Mrs. Gentile walked off to purchase beer. A short time later Denmark attempted to locate her and found her conversing with defendant, who was sitting in a tan-colored van. After a brief conversation in which defendant propositioned Mrs. Gentile, Denmark walked away with her, and defendant drove off in the van. Denmark identified defendant from a series of photographs shown to him by the police.

Mrs. Gentile and her two companions then drove back to Sparland, arriving at her house at 6 a.m. By this time Mrs. Gentile was quite intoxicated, as were Denmark and Williams to a lesser extent. Williams remained in the car and fell asleep while Denmark and Mrs. Gentile went inside and almost immediately fell asleep on the couch. Neither Denmark nor Mrs. Gentile remembered seeing Miss McCune at this time. When Denmark awoke at 9 a.m. he did not see Miss McCune, although he saw her shoes, jacket and panties lying on the floor by the dining room table.

Defendant and two other men, Sutton and Louchs, were employed by an Indianapolis firm which had contracted to do maintenance work at the Caterpillar plant in Peoria. Defendant and Sutton rented a trailer at a mobile home park in Peoria, and Louchs lived in his camper. The three men used a company vehicle, a tan-colored van, for transportation.

On April 19, they finished work at 10:30 p.m. and drove to a gas station where the gas tank was filled and the windows were cleaned. Then they stopped at a tavern and drank a few beers. Louchs left around midnight and could not recall if defendant and Sutton were in the tavern when he left. Sutton was uncertain as to what time he and defendant left the tavern, but in an earlier statement he had told police he was with defendant until midnight. Defendant dropped Sutton off at their trailer and drove away. The next morning the van was parked by the trailer with the gas tank three-quarter's empty and the windshield covered with bugs. Defendant arrived at work shortly after 8 a.m. saying that he had taken a cab to work. Defendant used the van during his lunch hour, stating that he wanted to look at a used car which was for sale. Sutton and Louchs testified that defendant had been very interested in purchasing a used car during the month of April and that defendant had expressed an interest in a 1962 Chevy II.

Mr. and Mrs. Hill lived in a trailer directly across from the trailer occupied by defendant and Sutton at the mobile home park in Peoria. When they returned to the trailer on April 25, they found blood stains on

and around the bed and a previously unused meat cleaver that had been unwrapped and washed during their absence. The telephone wires were cut and there were pry marks at the outside of the rear door. Mr. Hill found a classified ad on the floor advertising a 1962 Chevy II for sale for $195. Mrs. Hill subsequently identified the blankets in which the victim's body was wrapped and the sash as belonging to them. Lab tests revealed that some of the blood stains were type "O", which was the same type as the victim's blood.

The police searched defendant's trailer after obtaining permission and found a screwdriver underneath defendant's clothing in a chest of drawers. Defendant initially told the police that the screwdriver belonged to him. However, the screwdriver belonged to Louchs and had previously been in the van, and subsequently defendant told police that he had taken it to repair a radio. A police officer testified that when he showed defendant the classified ad found in the Hill trailer, defendant stated that he had cut out an ad like that and carried it with him.

A tool mark expert testified that he made a microscopic comparison of the pry mark on the Hill trailer door with samples of pry marks made by the screw driver found in defendant's possession. In the expert's opinion, the screwdriver positively made the pry mark on the door.

Ronald Edwards, who had been incarcerated in the county jail with defendant, testified that defendant had told Edwards that he killed Miss McCune after a "sex party." Edwards had three previous felony convictions, and in return for his testimony the State offered to move for an appeal bond in his behalf and agreed to attempt to have Edwards incarcerated in Vandalia rather than Joliet. Edwards also admitted reporting another jail-house admission of a fellow prisoner.

Defendant testified that he stayed in Peoria during the evening of April 19 and engaged the services of a prostitute in the early morning hours of April 20. Defendant stated that he left the van at his trailer and drove to the woman's house in her car, and then took a cab to work. During his lunch hour on April 20, he took the van to look at a car advertised for sale. William Murr testified for the defense that defendant came to his place of employment between noon and 1 p.m. on April 20 to look at a car being offered for sale and stayed between 15-20 minutes.

The first issue is whether the evidence is sufficient to establish defendant's guilt beyond a reasonable doubt. We find that it is.

It is the function of the jury to weigh testimony, judge credibility and resolve disputed factual matters. Weight and sufficiency of the evidence are matters peculiarly within a jury's province, and a reviewing court will not disturb the jury's finding unless based on evidence so improbable or implausible as to cause a reasonable doubt of the accused's guilt. *People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645, *cert. denied*, 393 U.S.

1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004; *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771, *cert. denied,* 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578.

■■ The evidence here clearly shows that the victim was taken to the Hill trailer, which was across from defendant's trailer. A classified ad for a car in which defendant had been interested was found in the Hill trailer. Moreover, defendant had clipped an ad for that particular car and had carried the ad with him. A microscopic comparison by a qualified expert revealed that pry marks on the Hill trailer door were made by a screwdriver found underneath defendant's clothing in a chest of drawers. The fact that the van which defendant drove on the night in question had used three-quarter's of a tank of gas and was covered with bugs is consistent with the driving necessary to go between Peoria and Sparland and contradicts defendant's testimony that he remained in Peoria. There is also the testimony of Ronald Edwards regarding statements made by defendant while incarcerated, although such testimony is ordinarily suspect and is to be viewed with caution.

■■ Regarding the conviction for indecent liberties, a vaginal swab revealed the presence of intact sperm, although medical testimony was unable to determine how recently intercourse had taken place. However, the victim, age 13, was found nude from the waist down and her brassiere had been cut in two. In the absence of contrary evidence, we believe these facts support a finding that Miss McCune's murderer also committed the offense of indecent liberties.

Accordingly, we find that the evidence is sufficient to support the convictions. See *People v. Murdock* (1971), 48 Ill. 2d 362, 270 N.E.2d 21, *cert. denied,* 404 U.S. 957, 30 L. Ed. 2d 274; 92 S. Ct. 324, *People v. Mackins* (1st Dist. 1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied,* 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786.

Defendant next contends that results of a polygraph examination which was administered to defendant by the police were improperly excluded.

■■ In Illinois, it is well established that results of polygraphic examination are inadmissible absent a stipulation by both parties. *(People v. Zazzeta* (1963), 27 Ill. 2d 302, 189 N.E.2d 260.) In *People v. Nicholls,* which involved a similar situation, our Supreme Court stated: ·

"We have consistently held that results of polygraphic examination cannot properly be introduced as evidence either of guilt or innocence of an accused." (42 Ill. 2d 91, 97.)

Accord, *People v. Mason* (5th Dist. 1975), 29 Ill. App. 3d 121, 329 N.E.2d 794.

The final issue concerns the trial court's refusal to give the second paragraph of IPI Criminal No. 3.02, which reads as follows:

> "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

Defendant contends that there was no direct evidence with regard to the indecent liberties charge.

The Committee Comments to this instruction provide that the second paragraph should only be given when proof of guilt is entirely circumstantial. In determining whether this paragraph is appropriate, any admissions by defendant are to be considered as direct evidence. (*People v. Brown* (1974), 56 Ill. 2d 312, 307 N.E.2d 356, *rev'd and rem. on other grounds,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) There, defendant's admission that he tied up the victim before the victim was shot by someone else was held to constitute direct evidence of defendant's participation in the crime of murder. See also *People v. Mickelson* (3d Dist. 1975), 32 Ill. App. 3d 813, 336 N.E.2d 806.

■■ In the instant case, Edwards testified that defendant stated he had killed Miss McCune after a sex party. In addition, there was evidence regarding the victim's age and the presence of sperm in her vagina, which constituted direct evidence of the offense. (See *People v. Bolton* (3d Dist. 1976), 35 Ill. App. 3d 965, 343 N.E.2d 190; *People v. Christiansen* (2d Dist. 1969), 118 Ill. App. 2d 51, 254 N.E.2d 156.) Therefore, we find no error in the trial court's refusal of this instruction.

As our Supreme Court has repeatedly said, the purpose of review in a criminal case is not to determine whether the record is perfect but rather to determine whether the defendant has had a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond all reasonable doubt. *People v. Ward* (1965), 32 Ill. 2d 253, 204 N.E.2d 741, *cert. denied,* 384 U.S. 1022, 16 L. Ed. 2d 1026, 86 S. Ct. 1947.

After thoroughly considering all the matters assigned and argued in this court we conclude that defendant had a fair trial, free from prejudicial error, accordingly, the judgments of conviction of the Circuit Court of Peoria County are affirmed.

Affirmed.

BARRY, J., concurs.

Mr. JUSTICE STOUDER, specially concurring:

I agree with my colleagues the evidence is sufficient to support the judgment in this case and I agree with the reasons set forth supporting such result. However, with respect to the circumstantial evidence instruction it is my opinion the full instruction should have been given but in view of the difficulties in determining what evidence is direct evidence and what is not, it appears to me there is at present no criteria for

determining whether the instruction should or should not be given in full. (See my dissenting opinion in *People v. Minish,* 19 Ill. App. 3d 603, 312 N.E.2d 49.)

When we speak generally of direct and circumstantial evidence we are endeavoring to talk about the relative quality of the evidence. We emphasize that neither kind of evidence is good or bad but rather that some kinds of evidence may be more probative than others depending upon the situation and the facts to be proved. With respect to circumstantial evidence such evidence may but need not support the final inferences for which such evidence is introduced. In the common use of the term some of the inferences may be coincidental and equally subject to contrary inferences and it is for this reason in some cases caution about the ultimate inference is required. In other types of cases the ultimate inference may be quite probable and hence the probative value of the basic evidence is high.

My colleagues have suggested the statement of the defendant to a co-prisoner in jail is direct evidence. They have also suggested the evidence of age and the medical opinion that the sample tested was sperm were also direct evidence. With respect to the defendant's statement it is clear that within the usual meaning such a statement is not direct evidence. However, where such a statement amounts to a confession it is sometimes said that it is of even more probative value than direct evidence and considered of higher and perhaps the highest quality of evidence. A statement to a fellow prisoner is quite different from a confession and in fact is usually considered of little or no probative value. Evidence of age certainly has nothing to do with direct evidence that a crime was committed or by whom and is permitted as an exception to the hearsay evidence rule. If direct evidence generally refers to eyewitness testimony of the occurrence then expert testimony of whatever its character could not be considered direct evidence.

The giving of the full circumstantial evidence instruction is usually opposed by the prosecution for the reason that it appears to be akin to a reasonable doubt instruction couched in terms more favorable to the defense than to the prosecution. On the other hand, some defendants do not like the full instruction because it calls attention to the fact the jury is not required to believe alternative possibilities. In any event it seems to me the exercise of determining whether evidence is direct or circumstantial is of no useful purpose in the absence of some definitive exposition on the reasons for the instruction and the distinctions which are applicable.

Accordingly, even though I believe the evidence in this case is all circumstantial, I am not persuaded the recommendation of the drafters of the Uniform Pattern Instructions are viable at this time.