THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE HOLMES, Defendant-Appellant.

First District (2nd Division) No. 1—89—1593

Opinion filed September 8, 1992.

James A. Graham and Martin B. Shapiro, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Lajauina Camel was found dead in the hallway of an apartment building located at 4327 West 18th Street in Chicago at approximately 6 a.m. on Saturday, April 11, 1987. After a bench trial, defendant Tyrone Holmes was convicted of her murder and of criminal sexual assault.

The victim's mother, Arlena McKinley, testified that at about 3 a.m. on April 11, 1987, she attended a party at "Miss" Powell's house, which was across the street from her residence. McKinley said she saw "Miss" Powell, Mr. Powell, Donald Blizzard, a woman named Theresa, defendant's brother Lonnie Holmes, and Lajauina at the party; that she talked to Lajauina at the party because she wanted her to come home; and that she did not see any marks under her chin. McKinley left the party before 4 a.m. with Lonnie Holmes and went to a liquor store where she purchased a half-pint of "Martell" cognac, a 40-ounce bottle of "Olde English 800" malt liquor, and a package of "Benson & Hedges" and "Newport" cigarettes. She stated that upon returning to the party shortly after 4 a.m. she did not see any marks on her daughter's neck or chin. After about 20 minutes had passed, McKinley left the party alone after asking Lajauina to leave with her, and arrived home at about 4:35 a.m. with the cognac, but left the beer behind, "probably" with her daughter. McKinley stated further that when she left the party her daughter was drinking with "Miss" Powell, Mr. Powell, Lonnie, a woman named Susan, Theresa, and possibly Theresa's husband, Steve, and that "Miss" Powell had told her that she would see that someone walked Lajauina home. When asked if these were the people with whom her daughter kept company, McKinley answered that her daughter had a baby with defendant's brother Randy. According to McKinley, her daughter knew defendant

very well and for practically all of his life. She said that he referred to her daughter as "sis," to her as "mama," and that he had been friendly with her and her family.

Jacqueline Wilson, who lived on the third floor of the building where the victim was found, testified that she awoke at about 4:30 a.m. that morning when she heard a noise, but went back to bed after she looked outside her door and found no one there. She later testified that the noise was coming from an apartment on her floor and that it wasn't unusual to hear noise in the building. She left her apartment at about 5 a.m. to meet her boyfriend after work and when she got to the hallway she heard arguing and a man's voice which said, "Don't shout out my name." Wilson stated that when she got to the back stairway she could see the people walking downstairs, and that she could hear their voices, but that she couldn't make out what they were saying because of the music coming from the apartment around the corner. She said that she followed them downstairs and that when she reached the bottom stair she smelled cigarette smoke. Wilson testified that she went to the back door and saw Lajauina, who was her friend, with a male, whom she identified as defendant. She testified further that defendant was holding Lajauina's arm, that Lajauina had tears in her eyes and a fresh bruise that was not bleeding under her chin. Wilson testified that she asked defendant, who was smoking a Newport, for a cigarette. According to Wilson, who was standing close to defendant, there was a light on in the hallway and she had no trouble seeing his face. In addition, she testified that Lajauina tried to talk to her but defendant led her out the door by the arm and said, "Come on here." She said that Lajauina and defendant, who was wearing a tan trench coat, walked through a muddy area toward some rowhouses. Wilson testified that she left through the front door, went to a pay phone to call her boyfriend, since she did not have a phone in her apartment, and then returned to her apartment using the front stairway and went to bed. She said that she did not see either of the couple with a bottle, and that she did not see a bottle as she went downstairs. She acknowledged that Lajauina was not striking out at or yelling at defendant, that he was not hitting or yelling at her, and that Lajauina did not ask her for help. Although Wilson testified that she thought her friend was in trouble, she admitted that she did not do anything about it.

Linda Burnett, who lived on the second floor of the building where the victim was found, testified that she had heard a thumping noise under her kitchen, which is adjacent to the stairway, at about 5:30 a.m. but that she continued to get ready for work. According to

Burnett such noises were not unusual. She testified further that she discovered the body a few minutes after 6 a.m. as she was leaving for work, returned to her apartment and called the police.

Officer Frederick Thomas, an evidence technician with the Chicago police department, testified that the victim's body was lying on the stairway landing between the first and second floors. He also testified that there was a corked bottle of "Old English brand 88" malt liquor in the corner of the stairwell a few feet from the body. He dusted the bottle for fingerprints. Thomas also recalled that he had inventoried a gold chain, which was found on the second-floor landing by the stairway door. He did not not recall whether he saw mud in the stairwell area, although he noted that there was mud outside.

Officer Thetris Patterson of the Chicago police department's latent prints section testified that, in his opinion, one of the three prints found on the malt liquor bottle was made by defendant's left ring finger. Only one of the remaining two prints on the bottle was suitable for comparison. According to Patterson, this print did not match defendant's prints, was not compared to the victim's prints and, although it was run through the Automated Fingerprints Identification System, it was never identified. He testified further that it is impossible to determine whether a print was made by a male or female, or how old it might be.

Chicago police department detective Gene Harris testified that he found the victim's body lying on the back stairway landing between the first and second floors. He said that her blouse was pulled up under her breasts and that she was naked from the waist down, her blue jeans hanging from her left ankle. According to Harris, the victim had one red shoe on and the other was three steps above her on the stairway. He also testified that he found an empty large quart beer bottle about a foot and a half from her left foot, a broken gold chain, and noticed a muddy boot print with a serrated pattern on the carpet. Harris testified further that the victim had blood in her mouth and a cut or a bruise on the right side of her chin.

In addition, Harris stated that he interviewed Burnett, Wilson, McKinley, "Mrs." Powell, and Lonnie Holmes. He said that McKinley told him she brought the beer and the cognac home with her after the party, and that he saw a half-pint of cognac and a bottle of "Olde English 800" malt liquor beer on her table. As a result of his investigation, Harris said that he eventually spoke to defendant over the phone at defendant's sister's house. According to Harris, defendant identified himself and stated that he would leave work and notify the police when he got home. Harris testified that when defendant arrived at his

sister's house, he arrested him on an outstanding warrant, brought him back to Area 4 headquarters, placed him in an interview room and advised him of his rights. He also said that he inventoried defendant's clothing, which included: a tan raincoat, gray striped pants, brown work boots and underwear.

Harris testified further that defendant agreed to talk with him and told him that he knew Lajauina and that he last saw her between 4:30 and 5 a.m. at the party. Defendant also told Harris that he arrived at the party at about 3:30 a.m., fell asleep on the couch, woke up when he heard Lajauina talking with "Mrs." Powell, got dressed and went to work. Harris then verified that defendant had been at work. He testified further that he confronted defendant with evidence that a female saw him with the victim at 5 a.m. in the hallway at 4327 West 18th Street. According to Harris, defendant told him that he met an old girl friend named Cora at a bar at about 2 a.m., went to her apartment, had sex with her, and left. He also told Harris that after he left he went to the party for his father, Mr. Powell, that Lajauina was at the party, that he fell asleep on the couch, woke up about 4:30, got ready and went to work. He told Harris that Lajauina caught up with him when he was on his way to the elevated train and asked him to go with her to Pookey's house at 4327 West 18th Street to purchase some marijuana. Defendant told Harris that he gave her $10, but that he never went inside, and that while he was waiting outside, a black female approached him and asked him for a cigarette, but he told her he did not have one. Harris said that defendant told him that Lajauina returned without any marijuana because Pookey did not have any, that she gave him his money back, and that he went to work. He said that he last saw her outside the building and that he never went in.

Detective Ralph Vucko, who came on duty at 4:30 p.m., also spoke with defendant after advising him of his rights. Vucko testified that defendant told him he was in the area of 4327 West 18th Street on April 11, 1987, when he met the victim, that he walked her to the building and entered the ground floor, where he waited while the victim went somewhere. He said that while he was waiting a black female approached him, asked him for a cigarette and then left. He said that he talked to the victim, asked her if she wanted him to walk her home, and then left for work after she declined his offer.

Cora Flowers, the former girl friend of defendant, testified that she met defendant at the Cotton Club at 3548 West Cermak at about 1 a.m. that morning. She also testified that they left the club together at about 2:30 a.m. and went to her apartment. She said that defend-

ant stayed about a half hour and that he asked her to have sex but she refused.

Cook County Deputy Chief Medical Examiner Dr. Edmond Donoghue testified that in his opinion the victim died as a result of strangulation. He testified that before performing the autopsy, he called in Dr. John Kenney to examine suspected bite marks on the victim's body. Dr. Donoghue found evidence of external injury including bruises and/or scrapes on the victim's neck, chin, eyebrow, right shoulder, right elbow, right forearm, right and left thighs, right knee, groin, lower back and right upper chest. He also found evidence of internal injury to the victim's larynx, trachea, lungs, lower neck and upper back muscles, temple and brain. He testified that the victim had a blood-alcohol level of .369 milligrams per deciliter. According to Donoghue, 12 to 14 12-ounce cans of beer in the hour before death or 16 to 17 cans of beer in a three- to four-hour period would have raised the victim's blood-alcohol percentage to that level. He also stated that a level of .420 milligrams per deciliter may be fatal. When asked whether Lajauina would have been able to walk, he answered, "That's difficult to say. She might be able to walk, yes."

Pamela Fish, of the Chicago police department's crime lab, testified that she examined the victim's blood and took swabs of the victim's mouth, vagina and rectum. According to Fish, there was semen, but no sperm, in the victim's vagina. The oral and rectal swabs were negative. She also analyzed a trench coat, a pair of pants, a pair of boots and a pair of underwear to determine if there was blood on them, but these items were not tested for the presence of semen or sperm. Blood was found to be present on defendant's trench coat, pants and on the lace area of his boots; Fish could not, however, conduct any further tests due to the insufficient amounts present.

Dr. John Kenney and Dr. Lowell Johnson testified as experts for the State that certain marks on the victim's body were bite marks inflicted by defendant. However, Dr. Larry Pierce and Dr. E. Stephen Smith testified as experts for the defense that the marks were not bite marks and that they were not inflicted by defendant. It is clear that all of these witnesses were qualified to testify as bite mark experts.

Defendant was sentenced to natural life in prison on the murder conviction and to 15 years' imprisonment on the criminal sexual assault conviction.

I

Defendant's first contention is that the trial court erred in deny-

ing his motion to dismiss for allegedly violating the speedy trial act (the Act). Section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 100—1 *et seq.*) provides:

"§103—5. Speedy trial. (a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, \*\*\* or by an interlocutory appeal.

(b) Every person on bail or recognizance shall be tried by the court having jurisdiction within 160 days from the date defendant demands trial unless delay is occasioned by the defendant, \*\*\* or by an interlocutory appeal.
\*\*\*

(d) Every person not tried in accordance with subsections (a), (b) and (c) of this Section shall be discharged from custody or released from the obligations of his bail or recognizance.

(e) If a person is simultaneously in custody upon more than one charge pending against him in the same county, or simultaneously demands trial upon more than one charge pending against him in the same county, he shall be tried, or adjudged guilty after waiver of trial, upon at least one such charge before expiration relative to any of such pending charges of the period prescribed by sub-paragraphs (a) and (b) of this Section. Such person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which judgment relative to the first charge thus prosecuted is rendered pursuant to Section 118—1 of this Act \*\*\*; if \*\*\* such period of 160 days expires without the commencement of trial of \*\*\* any of such remaining charges thus pending, such charge or charges shall be dismissed and barred for want of prosecution unless delay is occasioned by the defendant, \*\*\* or by an interlocutory appeal; provided, however, that if the court determines that the State had exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days." Ill. Rev. Stat. 1985, ch. 38, par. 103—5.

At the time of his arrest for murder on April 11, 1987, defendant, who had been released on bond, was awaiting trial on a robbery offense which occurred on January 2, 1987. On May 1, 1987, defendant filed a written trial demand which referred to his April 11, 1987, ar-

rest. The State elected to proceed on the murder charge which was set for trial on October 3, 1988, and October 24, 1988, but the State had moved for a continuance on each occasion. On October 3, 1988, according to the State, or October 24, 1988, according to defendant, the State changed its election from murder to robbery. Defendant objected to the State's change in election and noted that he was continuing his demand as to the murder charge. The judge stated, "The record will reflect your continued demand. I believe once the State has re-elected the demand no longer runs." On November 15, 1988, defendant was tried and convicted of robbery, and on December 14, 1988, he was sentenced to three years' imprisonment therefor. On March 15, 1989, the day set for trial on the murder charge, defendant filed a motion to dismiss for failure to comply with the speedy trial act. In denying the motion, the court held that subsection (e) applied even though there was not a demand on the other charges, that defendant did not have a right to pick what charges he would be tried on, that he was properly tried on the first charge within 120 days, and that a new term started at that time. Defendant's trial for murder began on April 17, 1989.

Although defendant admits that the State has a legal right to change its election, he contends that it should not be allowed to do so in order to occasion delay. He claims that the State changed its election so that its expert would have time to revamp his findings in response to criticism by defense experts. He further asserts that technical evasions of the Act by the State will not be tolerated. See *People v. Gooding* (1974), 21 Ill. App. 3d 1064, *rev'd on other grounds* (1975), 61 Ill. 2d 298; *People v. Hugley* (1971), 1 Ill. App. 3d 828.

■ The State maintains that the Act does not require that it even announce an election as to which case it will try first, but simply requires that it proceed to trial on any of the pending cases within the time period prescribed by the Act. Although not cited by the State, the case of *People v. Toolate* (1977), 48 Ill. App. 3d 1038, supports its position. There, the court stated:

"To hold that defendant was not chargeable with delay under these circumstances would be giving defendant an option to choose which charge to be tried on first. Nothing in the statute mandates such a result. On the contrary, a plain reading of section 103—5(e) is that the State need only bring defendant to trial on any one charge during the 120-day period when defendant is in custody on multiple charges." *Toolate*, 48 Ill. App. 3d at 1042.

Because defendant has failed to show that he was first brought to trial on one of the charges after the initial time period prescribed by the Act had passed, we hold that the State did not violate the Act by changing its election.

Defendant also maintains on the authority of *Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182, that he was deprived of his sixth amendment right to a speedy trial by the State's change of election. "Although the constitutional and statutory provisions address similar concerns, the rights established by them are not necessarily coextensive." (*People v. Garrett* (1990), 136 Ill. 2d 318, 323.) "The main distinction between a violation under the statute and an alleged denial of a constitutional speedy trial right is the degree of proof. Under the statute, a defendant who has not been brought to trial within the required time is not required to show actual prejudice or prosecutorial misconduct. A Sixth Amendment speedy trial challenge, however, requires not only delay but also substantial damage to defendant's ability to prepare for trial." 5 L. Pieczynski, Illinois Practice §10.4, at 275 (1989).

■ Although defendant claims that the State's change of election allowed its expert to completely revamp his findings, he admitted in oral argument before this court that despite such an alleged advantage in favor of the prosecution, he had ample time to prepare his case for trial. Therefore, we hold that defendant's right to a speedy trial was not abrogated.

Defendant further claims on the authority of *People v. Lawson* (1977), 67 Ill. 2d 449, that the State's late change in election denied him his right to due process. However, *Lawson* involved pre-accusation delay. In *People v. Schroeder* (1981), 102 Ill. App. 3d 133, 136, it was held that although post-accusation delay rising to the level of a violation of the constitutional right to a speedy trial can amount to a deprivation of due process in certain circumstances, the sixth amendment right to a speedy trial rather than *Lawson* applies to delays occurring after defendant is accused through arrest, indictment or complaint. Therefore, defendant's first assignment of error must be rejected.

II

Defendant next charges that the court erred in finding that the State had shown that certain injuries found on the victim's body were bite marks inflicted by him because he impeached the testimony of the State's expert. In addition, he claims that the accuracy of the State's expert's findings was based on an assumption not supported by the

record. Similarly, he also contends that the trial court erred in relying upon testimony about muddy shoeprints which it had previously excluded. Although defendant's argument is not very clear, it appears that he raises these contentions as part of the more comprehensive argument that the bite marks and other evidence did not establish beyond a reasonable doubt that he was guilty of murder. Accordingly, we will examine these issues as we review all of the evidence presented at trial.

Regarding the alleged bite marks, the State's expert, Dr. Kenney, testified that he used acetate overlays in making his initial comparison between defendant's teeth and the victim's injuries. He prepared the overlays by pressing the models of defendant's teeth into high density Styrofoam and then hand-tracing the marks that were made. As a result, Dr. Kenney issued a report on May 5, 1987, in which he found that: (1) the injury on the right side of the victim's jaw was a bite mark consistent with specific teeth from defendant's upper plate of teeth; (2) the injury to the left side of the victim's jaw was an abrasion and not a bite mark; and (3) the injury to the victim's clavicle area was a bite mark consistent with the left side of defendant's lower teeth: the left maxillary lateral incisor, left cuspid, left first bicuspid and left second bicuspid.

However, Dr. Kenney issued a later report in which he found that: (1) the injury on the right side of the victim's jaw was consistent with defendant's lower teeth; (2) the injury to the left side of the victim's jaw was consistent with defendant's upper teeth; and (3) the injury to the victim's right clavicle area was consistent with the right side of defendant's upper teeth: the right central incisor, right lateral incisor, right cuspid and the right first bicuspid. With respect to the injuries on the right and left side of the victim's jaw, although he admitted that he had no way of knowing how the bite was inflicted, Dr. Kenney testified that the victim's skin must have been manipulated 30 to 35 degrees to be consistent with his conclusion. He also testified that a portion of one of the defendant's teeth made a mark which fell a millimeter or two beyond the maximum distance that defendant could open his mouth. Regarding the injury on the victim's clavicle, Dr. Kenney testified that he did not find a corresponding mark made by defendant's lower teeth. It was his opinion that defendant's lower teeth may have hooked on the victim's T-shirt thereby preventing a mark. Although defendant objected to this testimony on the ground that there was no way by which Dr. Kenney could possibly know whether or not that was the case, the court allowed the testimony. In addition, Dr. Kenney admitted that there was no bruising between the

marks. Further, it is clear that Dr. Kenney was able only to identify similarities between the marks and certain of defendant's teeth.

Dr. Kenney testified that he issued the second report after he discovered a photograph which was taken by the medical examiner's office about three to six months after the first report was issued. Defendant notes that the photograph lacked the millimeter scale that Dr. Kenney used in his own investigation and which is routinely used by forensic odontologists. Dr. Kenney admitted he was aware that Dr. Smith, one of defendant's experts, was involved in the case and that Dr. Smith had requested to see his work-up at the time that he took a second set of impressions of defendant's teeth to be used in his second report. According to Dr. Kenney, the second set of impressions was made with a material that rendered more accurate results than that used for the first set of impressions. He also used more accurate photographic overlays rather than hand-drawn overlays for the second report. In addition, he measured how far defendant could open his mouth for the second report, which he did not do for the first.

Dr. Johnson, who also testified as an expert for the State, stated that his findings were consistent with Dr. Kenney's final report. Although he reviewed Dr. Kenney's materials, Dr. Johnson testified that he did not look at Dr. Kenney's reports until after his own analysis was complete.

Scott Schlesser, a medical photography expert for the defense, testified that the radiographic or X-ray images used by the defense's experts to compare defendant's teeth with the marks on the victim was more accurate than the photographic images used by the State's experts. Schlesser explained that when the image of a three-dimensional object is recorded onto two-dimensional space there is distortion. According to Schlesser, a radiograph is more accurate and contains less distortion than a photograph.

Dr. Pierce, another bite mark expert for the defense, testified that the injuries found on the victim's body were not bite marks at all. With respect to the injuries on the victim's jaw, Dr. Pierce said he had difficulty analyzing how the bite marks could have been inflicted in the direction that these marks made in the absence of a drag pattern, which is a scrape made by a tooth or some other object before it sinks into the skin. In fact, he noticed that the drag patterns went in the opposite direction of the alleged bite mark. According to Dr. Pierce, the injury on the right side of the victim's jaw was clearly a puncture wound. He testified that the injury seemed to have a three-dimensional component and that it was deeper than the other wound. Dr. Pierce also testified that the injury to the left side of the victim's

jaw was not a bite mark because there was no pattern of abrasion. With respect to the injury to the victim's clavicle, Dr. Pierce testified that the first problem was that there were only three marks in this area. That there were no other marks and especially that there were no other marks related to the same arch troubled him. In addition, although he noted that there are circumstances in which there are no marks made by the opposing (upper or lower) set of teeth, such as a single set of marks left on a hand after it struck someone's mouth, he stated that there are usually marks made by both the upper and lower teeth. He testified that there was no evidence of marks made by the opposing set of teeth. Moreover, Dr. Pierce explained that it would have been physically impossible for defendant to have inflicted the mark because his head would have been in the way. He reached this conclusion after attempting unsuccessfully to place a model of a head in such a position that a bite mark could have been inflicted. He testified that he could not account for where the defendant's lower jaw was in relation to the marks, or in what position his forehead and nose would have been in relation to the victim's neck.

Furthermore, Dr. Pierce testified that even if the marks were caused by biting, they could not have been made by defendant's teeth. With respect to the puncture wound on the right side of the victim's jaw, Dr. Pierce explained that such marks would usually be made by the canine teeth, which are longer, and that defendant's canine teeth, including the lower right canine, were worn down about even with the adjacent teeth. In addition, he testified that the marks were linear or curved slightly upwards whereas the defendant's teeth curved downward. He also testified that the injuries were inconsistent with defendant's buck teeth. He testified further that the force of a bite causes bruising but that there was no evidence of bruising in this case. Finally, he also explained that in order for defendant's teeth to have made the marks, his jaw would have to have been fully extended and therefore it would have been difficult for him to exert enough pressure to make the marks.

Dr. Smith stated that the injuries on the right side of the victim's jaw were not bite marks. He explained that he saw a series of different types of injuries in that area and that they lacked the pattern of a bite mark. As to the injuries on the left side of the victim's jaw, Dr. Smith was of the opinion that it was not a bite mark because it was linear and defendant's teeth were curved. With respect to the injury to the clavicle area, Dr. Smith testified that as a result of his experimentation with models of heads, he concluded that it was simply impossible to get a head in the position necessary to make the mark as

it occurred in this case. He also testified that even if the marks were bite marks defendant could not have inflicted them. As to the puncture wound, he stated that none of defendant's teeth was pointed enough to inflict it. Dr. Smith was of the opinion that in order to inflict the injuries, defendant's mouth would have to have opened over six centimeters, but that his mouth could open only 5.6 centimeters. He went on to point out that one of the victim's false teeth was broken and that there was bruising around her lips. Although he could not say when the tooth had been broken, Dr. Smith thought these injuries were consistent with a blow to the mouth.

■■ With regard to defendant's argument that the State's experts assumed facts not in evidence, the State maintains that Dr. Kenney's opinion that defendant's teeth caught on the victim's T-shirt was a plausible explanation for the lack of lower teeth marks and that his opinion was supported by evidence which showed that the victim was wearing a T-shirt which was pulled up near her breast. Although it appears that Dr. Kenney was speculating that defendant's teeth may have caught on the victim's shirt in order to explain the lack of a corresponding set of marks on the clavicle injury, and assuming that the court erred in admitting such testimony, its ruling should not be reversed absent a clear showing that the trial court abused its discretion to the manifest prejudice of the defendant. *People v. Wright* (1991), 218 Ill. App. 3d 764, 771.

Moreover, regarding defendant's argument that the State's experts' testimony was impeached, as the State points out, the credibility of an expert is a matter for the trier of fact to determine (*People v. Peterson* (1988), 171 Ill. App. 3d 730, 734), and if expert testimony is conflicting, the reviewing court should not substitute its judgment for that of the trier of fact. (*People v. Racanelli* (1985), 132 Ill. App. 3d 124, 129.) We note further that the ultimate issue is for the court and not the expert to decide. *People v. Brown* (1982), 110 Ill. App. 3d 1125, 1129-30.

Regarding the muddy shoe prints, Officer Harris testified:

"A. Yes, there was [*sic*] muddy shoe prints on there, fresh muddy shoe prints, muddy shoe prints on the carpet and it appeared to be made by some type of serrated boot.

MR. GRAHAM: Objection to appeared to be, Judge.

THE COURT: Sustained.

MR. GRAHAM: Ask that it be stricken.

THE COURT: It will be stricken.

BY MR. HOWARD:

Q. Did the muddy footprint you saw on the carpeting have any type of pattern impression to it?

A. Yes, it had a serrated pattern. There was like you would see a mark and it would be a break, then another mark, then a break in it, like a traction-type boot.

\* \* \*

A. Yes, this picture shows the muddy footprints, shoe prints that was on the carpet in which we—I looked at the boot and it matched up with the boot that Tyrone was wearing.

MR. GRAHAM: Objection.

MR. SHAPIRO: Objection.

THE COURT: Sustained.

MR. GRAHAM: I ask that it be stricken.

THE COURT: It will be stricken and not considered."

Although the court struck portions of Harris' testimony, defendant claims that the following statements made by the court in announcing its verdict demonstrate that it considered this evidence in convicting defendant:

"The court in making its decision is perfectly aware of the conflicting expert testimony but I am also aware of the other evidence in this Court in this case and clearly this case does not fall or rise solely on the fact of whether these were bite marks or not bite marks. There are [sic] other evidence including finger print evidence and even a muddy foot print."

Defendant notes further that no cast impressions were taken, that defendant's boots were not taken to the scene and compared with the prints, and that no mud samples were taken. In addition, Harris made no mention of the muddy prints in his report. Defendant claims that the court's exclusion of the evidence led the defense to believe that the court was not considering the evidence and therefore the defense did not refute it.

However, as the State points out, the trial court in a bench trial is presumed to have considered only competent evidence (*People v. Shaw* (1981), 98 Ill. App. 3d 682, 686-87), and in order to rebut this presumption, there must be an affirmative showing on the record that the court actually used the improper evidence. (*People v. Perez* (1983), 115 Ill. App. 3d 446, 451.) The State maintains that there was ample properly admitted evidence about the prints on which the trial judge properly relied.

In this case, it is clear that Harris was not qualified to testify about the identity of the footprint. However, it also clearly appears that the judge excluded only the testimony regarding the identity of

the print, but not the fact of the print itself. Because defendant has not affirmatively shown that the court considered the testimony regarding the identity of the shoeprint, we must engage in the presumption that it did not.

Turning to the larger question of whether the evidence was sufficient to convict defendant, he asserts that in order to convict on the basis of circumstantial evidence, the proof must produce a reasonable and moral certainty that the accused and no one else committed the crime. (See *People v. Butler* (1963), 28 Ill. 2d 88; *People v. Ware* (1980), 82 Ill. App. 3d 297; *People v. Donahue* (1977), 50 Ill. App. 3d 392.) However, as the State points out, this is no longer the standard. Whether the evidence of the crime is direct or circumstantial, the standard of review is the same. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291; *People v. Acklin* (1990), 208 Ill. App. 3d 616, 621, *appeal denied* (1991), 137 Ill. 2d 666.) The test for determining the sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Herrett* (1990), 137 Ill. 2d 195, 203.) We further note that it is not the function of a reviewing court to retry defendant. *People v. Eyler* (1989), 133 Ill. 2d 173, 191, *cert. denied* (1990), 498 U.S. 993, 112 L. Ed. 2d 550, 111 S. Ct. 215.

Defendant claims that the trial court in this case gave little or no insight into its thinking; it found both sets of experts credible and said that it came to its own conclusions. In announcing its verdict the court stated:

"The Court has in great detail gone over the testimony and in great detail gone over each of the exhibits ***. The Court has gone over *** this evidence and these exhibits on Friday before leaving this building, as well as starting at 7:30 this morning. *** The Court wondered in its own mind how experts, and clearly they were all experts in the field, could come up with such different conclusions. The Court is now satisfied in its own mind as to why there could be such a difference.

The Court has conducted every possible observation with the evidence, *** and the Court has come to its own conclusions.

Based on the evidence *** the Court believes that the State has proven the defendant guilty beyond a reasonable doubt as to the charge of murder, the charge of sexual assault, as well as the charge of felony murder. The court in making its deci-

sion is perfectly aware of the conflicting expert testimony but I am also aware of the other evidence in this Court in this case and clearly this case does not fall or rise solely on the fact of whether these were bite marks or not bite marks. There are [*sic*] other evidence including finger print evidence and even a muddy foot print.

In addition to that, it is satisfied that experts can differ, especially when you are dealing with photographs when taken of a two dimensional object or of a three dimensional object of what the human body is and especially when you are dealing with various degrees of that.

This Court is satisfied that the teeth marks—and I do believe that they are teeth marks—were made by the defendant. The Court is also well [*sic*] that the teeth are also dimensional [*sic*]. ***

The Court has considered, and I am convinced beyond a reasonable doubt, that the defendant is the perpetrator and did commit these crimes."

■ We are unaware of a requirement that the trial court must offer insight into its thinking, and even assuming that there was such a requirement, we find that the court gave sufficient reasons for its decision.

Defendant relies on the authority of *Butler*, in which the court reversed defendant's conviction where the direct evidence was confused and conflicting on several vital questions of fact, and where the testimony, at best, established only that the defendant was present with three other persons all of whom had an equal opportunity to commit larceny. (*Butler*, 28 Ill. 2d at 92.) Although he acknowledges that the court also cited the shoeprint, and fingerprint evidence, defendant relies on the authority of *People v. Donahue* (1977), 50 Ill. App. 3d 392, in which the court reversed a conviction on the ground that the only evidence was a fingerprint of the defendant in the apartment where the murder was committed. According to the court, fingerprint evidence is sufficient evidence of defendant's identity if the print could only have been made at the time of the crime. *Donahue*, 50 Ill. App. 3d at 393-94; see also *People v. Ware* (1980), 82 Ill. App. 3d 297.

In this case, the expert testimony regarding the alleged bite marks was sharply conflicting. With respect to the muddy shoeprint, our supreme court has recently reiterated that " 'evidence of shoeprints has no legitimate or logical tendency to identify an accused as the perpetrator of a crime unless the circumstances support this triple *inference*: (1) That the shoeprints were found at or near the place of

the crime; (2) that the shoeprints were made at the time of the crime; and (3) that the shoeprints correspond to shoes worn by the accused at the time of the crime.' (Emphasis added.) [Citation.] These three circumstances *** test the weight to be given shoeprint evidence." (*People v. Campbell* (1992), 146 Ill. 2d 363, 381.) According to the *Campbell* court, the number of similarities found between a test print and the defendant's shoe goes to the weight of the evidence and therefore the question of whether there is a sufficient number to make a positive identification is for the trier of fact. (*Campbell*, 146 Ill. 2d at 384-85.) In the absence of expert testimony linking the muddy print to defendant, we find that it carries little weight. Similarly, we note that the evidence of blood on defendant's clothing was of little moment because the serologist was able to conclude only that it was human blood. Nevertheless, even though our opinion as to the inferences to be drawn from the evidence in this case might differ from those made by the trial court, we conclude, in viewing the evidence in the light most favorable to the prosecution, that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Therefore, we reject this contention of error.

## III

Defendant also maintains that the State failed to prove beyond a reasonable doubt that he was guilty of criminal sexual assault. In support of this contention, defendant argues that the State presented evidence showing that the victim was found naked from the waist down and that semen but no sperm was found in her vagina. He notes further that there was no trauma or bruising to the victim's vagina, uterus, fallopian tubes or ovaries, and that due to the victim's blood-alcohol level it was questionable whether she would have been able to walk. Defendant asserts that no other evidence was presented on the issue of criminal sexual assault and therefore there was an insufficient amount of evidence to convict him. The State responds that taken as a whole the circumstantial evidence established defendant's guilt of criminal sexual assault beyond a reasonable doubt.

As previously noted, the State is correct in its assertion that the reasonable hypothesis of innocence standard of review cited by defendant (*People v. Widmayer* (1948), 402 Ill. 143) is no longer available in Illinois. Instead, the test for determining the sufficiency of direct or circumstantial evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. *People v. Herrett* (1990), 137 Ill. 2d 195, 203; *People v. Pintos* (1989), 133 Ill. 2d 286, 291; *People v. Acklin* (1990), 208 Ill. App. 3d 616, 621, *appeal denied* (1991), 137 Ill. 2d 666.

Pursuant to section 12—13(a)(1) of the Criminal Code of 1961, an accused commits criminal sexual assault if he or she commits an act of sexual penetration by the use of force or threat of force. (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1).) Further, section 12—12(f) provides that sexual penetration means any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person. Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).

The State emphasizes that the evidence showed that the victim's blouse was pulled up, that she was naked from the waist down, that there was mud on the left side of her abdomen and on her inner thigh, that there were bruises on her thighs and groin and that there was semen present in her vagina. According to the State, Illinois courts have repeatedly upheld convictions for sex offenses based on circumstantial evidence similar to that found here. See *People v. Murdock* (1971), 48 Ill. 2d 362, *cert. denied Murdock v. Illinois* (1971), 404 U.S. 957, 30 L. Ed. 2d 274, 92 S. Ct. 324; *People v. Fletcher* (1976), 40 Ill. App. 3d 537; *People v. Mackins* (1974), 17 Ill. App. 3d 24, *cert. denied sub nom. Morrow v. Illinois* (1975), 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786.

In *Murdock*, the victim was found on a bed with her pajama bottoms hanging on her lower right leg. Although there were no bruises or other indications of trauma to the victim's thighs or vagina, and no traces of skin, hair or fibers were found under her finger nails, her left eye was blackened and there were numerous abrasions on her neck. The pathologist found that the victim had recently engaged in sexual intercourse and had consumed enough alcohol to be in a state of near intoxication. The cause of death was strangulation. (*Murdock*, 48 Ill. 2d at 364.) The court stated that the defendant's testimony showed that he was on the premises and committed the crime of burglary, and it found that the evidence in the record was sufficient to support the judgments on the other crimes charged. *Murdock*, 48 Ill. 2d at 367-68.

Likewise, in *Fletcher*, the victim, who was bruised and whose skull was fractured, was found naked from the waist down and her brassiere was cut in front. The cause of death was strangulation. A vaginal swab revealed the presence of intact sperm. (*Fletcher*, 40 Ill. App. 3d at 538.) There were bloodstains on the bed in the trailer where the victim had been baby-sitting, pry marks on the outside of

the rear door, and a classified ad for a 1962 Chevy II was found on the floor. Some of the bloodstains were the same type as the victim's blood. (*Fletcher*, 40 Ill. App. 3d at 540.) It was the opinion of an expert that a screwdriver found in the defendant's possession made the pry marks on the trailer door. In addition, the defendant admitted that he cut out the ad found in the trailer. (*Fletcher*, 40 Ill. App. 3d at 540.) The court held that the facts supported a finding that the murderer was the one who committed indecent liberties.

■ In this case, we note that the semen found in the victim's vagina was never identified. Nonetheless, as in *Murdock* and *Fletcher*, defendant's responsibility for the sexual assault is closely related to his responsibility for murder. After reviewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find all the elements of criminal sexual assault beyond a reasonable doubt. Therefore, defendant's third contention of error fails.

## IV

Defendant's final assignment of error is that the trial court abused its discretion in imposing a sentence of natural life in prison without the possibility of parole; he therefore requests that this court reduce his sentence on the murder conviction to a term of 20 years' incarceration. Defendant claims that the weight of mitigating factors present in this case, such as his limited criminal offense background, his consistent employment record and his potential for rehabilitation, demonstrate that the sentence was excessive. He further argues, on the authority of *People v. Goodman* (1981), 98 Ill. App. 3d 743, that the trial judge failed to set forth the reasons for the sentence with specificity. In *Goodman*, the court held that the record failed to demonstrate that the trial judge considered the appropriate criteria in imposing sentence because it did not contain any mention of mitigating factors. (*Goodman*, 98 Ill. App. 3d at 750-51.) Moreover, defendant claims that although the trial court never discussed his proclamation of innocence, its failure to justify its sentence indicates that it improperly relied on it in sentencing him. According to defendant, a more serious sentence may not be imposed merely because a defendant claims he is innocent at the time of sentencing. *People v. Speed* (1984), 129 Ill. App. 3d 348; *People v. Byrd* (1986), 139 Ill. App. 3d 859.

The State maintains, in light of defendant's criminal history and his conduct in this case, that the trial court properly exercised its discretion in sentencing him. In support of this contention, the State

notes that defendant's criminal history consists of a finding of juvenile delinquency based on rape and a robbery conviction. The State argues further that there is a strong presumption that a trial court's sentence is predicated on proper legal reasoning including consideration of any mitigating factors (*People v. Partin* (1987), 156 Ill. App. 3d 365, 373, *appeal denied* (1987), 116 Ill. 2d 571); and although it denies defendant's assertion that the court considered his proclamation of innocence, it argues that the court had a right to consider it in light of the other facts in the case. (*People v. Ward* (1986), 113 Ill. 2d 516, 530, *cert. denied* (1987), 479 U.S. 1096, 94 L. Ed. 2d 168, 107 S. Ct. 1314.) According to the State, a natural life sentence was available in this case based on: (1) the trial court's finding of brutal and heinous conduct, and (2) the fact that the murder was committed during the commission of the felony offense of criminal sexual assault. Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1.

Although Supreme Court Rule 615(b)(4) (107 Ill. 2d R. 615(b)(4)) grants this court the authority to reduce sentences, because the trial court is in the best position to determine an appropriate sentence, its sentence is entitled to great weight and will not be overturned absent an abuse of discretion. (*People v. Felella* (1989), 131 Ill. 2d 525, 541; *People v. Cabrera* (1987), 116 Ill. 2d 474, 494, *cert. denied* (1987), 484 U.S. 929, 98 L. Ed. 2d 257, 108 S. Ct. 297.) Nevertheless, as defendant notes, that the sentence imposed is within the confines of the sentencing statute does not necessarily preclude a reduction. *People v. Steffens* (1985), 131 Ill. App. 3d 141, 151.

■ Contrary to defendant's assertion, we do not believe the mitigating factors demonstrate that the sentence was excessive. Moreover, in *Goodman* the court found that although there was considerable evidence in the record relevant to the possibility of defendant's rehabilitation, there was simply no indication that the trial court actually considered the evidence in sentencing the defendant. (*Goodman*, 98 Ill. App. 3d at 751.) However, in this case, it is clear that the court considered mitigating factors at the capital punishment phase because, although it found that defendant was eligible for the death penalty, it stated that it felt there were mitigating factors which precluded its imposition. Further, if the record reflects that the trial court considered mitigating factors and rehabilitative potential at the capital punishment phase of sentencing, then the reviewing court may assume, unless shown otherwise, that those same factors were considered in determining the final sentence. (*Goodman*, 98 Ill. App. 3d at 752; *People v. Smith* (1980),

91 Ill. App. 3d 438, 451-52, *rev'd on other grounds* (1982), 93 Ill. 2d 179, *cert. denied* (1983), 461 U.S. 937, 77 L. Ed. 2d 312, 103 S. Ct. 2107.) Besides, in imposing defendant's sentence, the court stated:

 · "The Court has considered all the personal information dealing with Mr. Tyrone Holmes, including his prior felony conviction, the finding of delinquency by the Court, and for what particular act was alleged [*sic*].

 The Court is also considering the personal history of the Defendant, his educational background, his employment history, both past and present, before he was arrested, his family situation, his marital status, physical, mental health, his alcohol and drug history.

 The Court, taking all this into consideration and the likelihood for rehabilitation, finds that the acts committed here, that this murder was accompanied by extremely brutal and heinous behavior which is indicative to myself of wanton cruelty."

In sum, it is clear to us that the trial court considered mitigating factors in imposing sentence and that it stated its reasons for defendant's sentence with sufficient specificity. Furthermore, there is no indication in the record that the judge imposed a more severe sentence because of defendant's proclamation of innocence. Accordingly, we cannot conclude that the trial court abused its discretion in sentencing defendant to natural life in prison without the possibility of parole.

 For all of the above-stated reasons, the decision of the circuit court is affirmed.

 Affirmed.

 HARTMAN, P.J., and McCORMICK, J., concur.